STATE OF CONNECTICUT *v.* RON ALEX JAMES
(AC 32807)

Robinson, Bear and Peters, Js.

Argued October 25, 2012—officially released March 5, 2013

*Susan M. Hankins*, assigned counsel, for the appellant (defendant).

*Mitchell S. Brody*, senior assistant state's attorney, with whom, on the brief, were *Michael Dearington*, state's attorney, and *Gary Nicholson*, senior assistant state's attorney, for the appellee (state).

*Opinion*

ROBINSON, J. The defendant, Ron Alex James, appeals from the judgment of conviction, rendered after

a jury trial, of two counts of assault in the first degree with a firearm as a principal or accessory in violation of General Statutes §§ 53a-59 (a) (5) and 53a-8 and conspiracy to commit assault in the first degree with a firearm in violation of General Statutes §§ 53a-48 and 53a-59 (a) (5). The defendant claims that (1) the court improperly denied his motion for a judgment of acquittal because the evidence presented to the jury was insufficient to prove beyond a reasonable doubt that he was one of the perpetrators involved in the shooting of the two victims, (2) the court improperly refused to charge the jury on the defense of third party culpability in violation of his right to due process and his right to present a defense and (3) prosecutorial improprieties in the prosecutor's argument to the jury also deprived him of his right to due process. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. At approximately 2 a.m. on September 20, 2005, Robert Pouncey and Chacarra Stephens were conversing in a first floor apartment at 429 Dixwell Avenue in New Haven. They were sitting on Pouncey's bed, near a window, when they heard multiple gunshots, and projectiles entered through the window. Pouncey was shot twice in the back; Stephens was hit five times in the legs. Neither victim saw who had fired the shots. Several nine millimeter shell casings were found on the ground below the window. The window screen and a fan that was in the window were perforated with bullet holes, and several projectiles were found inside the bedroom. A firearms examiner later determined that the gunshots had come from a nine millimeter Beretta semiautomatic pistol and a .44 caliber Charter Arms Bulldog revolver.

Also at approximately 2 a.m. on September 20, 2005, Shaniya Bell, a resident of 559 Sherman Parkway, which is one street over from Dixwell Avenue, was looking out of her third floor apartment window when she observed

two black males exit from a grey Ford Focus parked on the street below. She noticed one of the two men handling a silver gun. Both men were wearing black shirts; one was wearing blue jeans, white sneakers and a "skully." Bell could not see the men's faces clearly enough to positively identify either of the men. The two men began to walk in the direction of Dixwell Avenue, at which point she lost sight of them. She called 911 to report seeing the gun. While on the phone, she heard several gunshots. Immediately after hearing the gunshots, she saw the same two men that she had observed earlier running from the direction of Dixwell Avenue. The men got into the grey Ford Focus, executed a U-turn and sped away southbound on Sherman Avenue, in the direction of Munson Street.

Police officers were dispatched to the area. Officer George Smith, Jr., was in his cruiser and responded to the call by driving west along Munson Street. As he was approaching Munson Street's intersection with Sherman Parkway, he saw a grey Ford Focus approaching southbound on Sherman Parkway; the vehicle then turned right onto Munson Street. The vehicle matched the description of the vehicle that the dispatcher had indicated over the police radio had been seen fleeing from the vicinity of the shooting. Smith activated the cruiser's overhead lights and siren, attempting to pull the vehicle over near the Munson Street intersection with Crescent Street. Officer Robert Levy pulled up behind Smith in another cruiser to assist Smith. When Smith and Levy got out of their cruisers to approach the vehicle, which had pulled over but had not come to a full stop, the vehicle sped off down Crescent Street. The police officers pursued in their cruisers, but eventually lost sight of the vehicle near the intersection of Osbourne Avenue and Dyer Street.

Other officers who had heard over the police radio about the search for the grey Ford Focus and who were

patrolling in a cruiser along Diamond Street, which intersects with Dyer Street, observed a baseball cap lying in the road. It was later determined that the inner brim of that cap contained the defendant's DNA. When the officers stopped to retrieve the cap, they noticed an unoccupied grey Ford Focus parked directly across from the cap in the driveway of 55 Diamond Street.

The owner of 55 Diamond Street had no connection to the Ford Focus found in his driveway; it was not in his driveway when he had gone to bed that night. A car rental contract found inside the vehicle indicated that the Ford Focus had been rented by Jamie Walker, the defendant's girlfriend, on September 12, 2005, and was scheduled to be returned on September 19, 2005. Jamie Walker had provided the rental car company with two telephone contact numbers, one of which was registered to a cell phone belonging to Elizabeth Tyson, the defendant's mother. Two fingerprints belonging to the defendant were found on the hood of the Ford Focus; a fingerprint belonging to a James Walker, Jr., was also found on the vehicle's right door, under the window.[1]

Two cell phones were found inside the vehicle. One of the cell phones belonged to Tyson. Later investigation revealed a call made from Tyson's cell phone on September 20, 2005, at 1:29 a.m., shortly before the shootings, to a number used by James Walker, Jr.[2] The other cell phone had Tyson's cell phone number stored in its database next to the name "Alley Doo," which was a nickname used by the defendant. When the police later spoke with Tyson regarding their interest in speaking with the defendant, she provided them with the cell

---

[1] The police lost the fingerprint evidence prior to trial, but nevertheless were permitted by the court to testify about their findings.

[2] When James Walker, Jr., responded to the police's attempts to contact him for questioning, he did so by paging them from two telephone numbers, one of which was the same number called by Tyson's cell phone at 1:29 a.m.

phone number for the phone found in the Ford Focus as the defendant's contact number.

The nine millimeter Beretta semiautomatic pistol used in the shooting was found in the rear yard of 54 Diamond Street, directly across the street from where the grey Ford Focus was located. At the base of a stockade fence located at the rear of 54 Diamond Street, the police found a clean, dry sneaker which contained DNA that later was found to be consistent with that of James Walker, Jr. On top of the fence, the police found some blue jean fabric. On the other side of the fence, the ground had been disturbed in a manner consistent with someone having jumped over the fence and landed. Following a police investigation, the defendant was arrested and convicted. This appeal followed.

I

The defendant first claims that the court improperly denied his motion for a judgment of acquittal because the only issue truly in contention at trial was the identity of the perpetrators involved in the shooting, and the evidence presented by the state regarding that issue was constitutionally insufficient to permit a rational juror to find beyond a reasonable doubt that the defendant was one of those perpetrators and, therefore, guilty as a principal, accessory or conspirator. Although there was no direct, eyewitness testimony placing the defendant at the crime staging area, at the shooting itself, in the vehicle that fled from the shooting or at the site where that vehicle was abandoned, we nevertheless agree with the state that there was sufficient circumstantial evidence from which the jury reasonably and permissibly could have inferred that the defendant was one of the perpetrators of the shooting and, thus, guilty of the crimes charged.

"In reviewing the denial of a motion for [a] judgment of acquittal, we employ a two part analysis. First, we

construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether, from all of the evidence and the reasonable inferences drawn therefrom, the jury reasonably could have concluded that the defendant was guilty beyond a reasonable doubt." (Internal quotation marks omitted.) *State v. Green*, 81 Conn. App. 152, 155, 838 A.2d 1030, cert. denied, 268 Conn. 909, 845 A.2d 413 (2004).

"We note that the jury must find every element proven beyond a reasonable doubt in order to find the defendant guilty of the charged offense, [but] each of the basic and inferred facts underlying those conclusions need not be proved beyond a reasonable doubt. . . . If it is reasonable and logical for the jury to conclude that a basic fact or an inferred fact is true, the jury is permitted to consider the fact proven and may consider it in combination with other proven facts in determining whether the cumulative effect of all the evidence proves the defendant guilty of all the elements of the crime charged beyond a reasonable doubt. . . .

"Because [t]he only kind of an inference recognized by the law is a reasonable one [however] . . . any such inference cannot be based on possibilities, surmise or conjecture. . . . It is axiomatic, therefore, that [a]ny [inference] drawn must be rational and founded upon the evidence. . . . [T]he line between permissible inference and impermissible speculation is not always easy to discern. When we infer, we derive a conclusion from proven facts because such considerations as experience, or history, or science have demonstrated that there is a likely correlation between those facts and the conclusion. If that correlation is sufficiently compelling, the inference is reasonable. But if the correlation between the facts and the conclusion is slight, or if a different conclusion is more closely correlated with the facts than the chosen conclusion, the inference is less reasonable. At some point, the link between the facts

and the conclusion becomes so tenuous that we call it speculation. When that point is reached is, frankly, a matter of judgment." (Citations omitted; emphasis omitted; internal quotation marks omitted.) *State* v. *Elsey*, 81 Conn. App. 738, 744–45, 841 A.2d 714, cert. denied, 269 Conn. 901, 852 A.2d 733 (2004).

Having construed the evidence presented in the present case in a light favorable to sustaining the jury verdict, as we must, we conclude that the cumulative effect of the circumstantial evidence presented, along with the reasonable inferences that the jury was permitted to draw therefrom, was sufficient to support the jury's finding of guilt beyond a reasonable doubt. "[T]here is no legal distinction between direct and circumstantial evidence so far as probative force is concerned"; (internal quotation marks omitted) *State* v. *Hart*, 118 Conn. App. 763, 778, 986 A.2d 1058, cert. denied, 295 Conn. 908, 989 A.2d 604 (2010); and proof beyond a reasonable doubt properly may be based on "a chain of inferences, each link of which may depend for its validity on the validity of the prior link in the chain." (Internal quotation marks omitted.) *State* v. *Torres*, 242 Conn. 485, 501, 698 A.2d 898 (1997). The jury reasonably could have relied on just such a chain of inferences as establishing proof beyond a reasonable doubt of the defendant's involvement in the charges at issue in the present case.

First, there was sufficient evidence from which the jury reasonably could have inferred that the perpetrators of the shooting had fled the scene in a grey Ford Focus, which vehicle they later abandoned after evading pursuit by the police. Prior to hearing gunshots that coincided with the shooting of the victims, Bell had observed two men, one of whom was "handling" a gun, arrive in the area in a grey Ford Focus. She saw the men move off in the direction of where the shooting

soon occurred on Dixwell Avenue and then, immediately after hearing shots fired, she observed them come running from the direction of the shooting and race off in the grey Ford Focus down Sherman Parkway.

The jury reasonably could have inferred from those facts that the men Bell observed fleeing from the scene were the same men who had been involved in shooting the victims, Pouncey and Stevens. The jury also could have inferred that the Ford Focus containing those fleeing perpetrators was the same vehicle that soon after was intercepted and chased by Officers Smith and Levy, because the vehicle matched the description of the vehicle given by Bell, the vehicle was observed a very short time after the shooting heading down Sherman Parkway in the direction that Bell reported, and the vehicle sped away from the police officers when they attempted to pull the vehicle over. It was equally reasonable for the jury further to have inferred that the grey Ford Focus found in the driveway at 55 Diamond Street was the same vehicle that had been used to flee the scene of the shooting and to evade the police. The car was the same color, make and model as the vehicle observed fleeing the crime scene. The vehicle was unknown to the occupants of 55 Diamond Street, and it was found shortly after the police had lost sight of the vehicle they were pursuing and in a location near to where the vehicle was last observed.

Additionally, the police found various evidentiary items along a direct path leading away from the vehicle to the rear of 54 Diamond Street that were consistent with suspects quickly exiting and fleeing from the vehicle. In that regard, the police found a baseball cap in the street directly behind the car, which was in the direction of 54 Diamond Street, one of the weapons used in the shooting was found in the backyard of 54 Diamond Street and a clean sneaker was found near a fence at the rear of that yard. The fence had a piece of

denim material at the top and evidence of disturbed ground on the other side. The jury reasonably could have inferred from the cumulative effect of the circumstantial evidence that the occupants of the Ford Focus had recently abandoned it and hastily fled in a path leading directly across the street to 54 Diamond Street, which logically would be consistent with perpetrators of a crime trying to evade capture. Accordingly, on the basis of a chain of reasonable factual inferences, the jury permissibly could have inferred the fact that the perpetrators of the shooting had fled the crime scene in the grey Ford Focus that was later abandoned and found at 55 Diamond Street.

There was also sufficient evidence from which the jury reasonably could have inferred the fact that the defendant was one of the occupants of the grey Ford Focus directly before and after the shooting. The defendant's DNA was found in the baseball cap discovered along the escape route from the vehicle. The defendant's fingerprints were found on the hood of the vehicle. A cell phone attributable to the defendant was found inside the car. Although registered to Tyson, there was additional evidence from which the jury could have inferred that Tyson had provided the defendant with the phone for his own use. In particular, when questioned by the police, Tyson gave the police that cell phone number as the defendant's contact number. His girlfriend, Jamie Walker, also used that number as one of the contact numbers she provided to the rental car company. Additionally, the second cell phone found in the Ford Focus had the cell phone number for Tyson's cell phone listed in its stored database next to a nickname used by the defendant. Finally, a call was made from Tyson's cell phone only one-half hour before the shooting to James Walker, Jr., whose fingerprints were also found on the Ford Focus and whose DNA was found on the sneaker that had been left along the escape

route of the perpetrators. The cumulative effect of the foregoing evidence, and factual inferences drawn therefrom, supports a reasonable inference that the defendant was one of the occupants of the Ford Focus.

On the basis of its reasonable inferences that the perpetrators of the shooting drove to and fled from the crime scene in the grey Ford Focus and that the defendant was one of the persons in that Ford Focus, the jury had sufficient facts from which to infer the ultimate fact, namely, that the defendant was, beyond a reasonable doubt, a principal or accessory to the shooting, as well as a coconspirator. Because there was sufficient circumstantial evidence from which the jury reasonably and permissibly could have inferred that the defendant was guilty of the crimes charged, the court properly denied his motion for judgment of acquittal.

## II

The defendant next claims that the trial court improperly failed to charge the jury on the defense of third party culpability thereby violating his right to present a defense and his right to due process. We disagree.

"In determining whether the trial court improperly refused a request to charge, [w]e . . . review the evidence presented at trial in the light most favorable to supporting the . . . proposed charge. . . . A request to charge which is relevant to the issues of [a] case and which is an accurate statement of the law must be given. . . . If, however, the evidence would not reasonably support a finding of the particular issue, the trial court has a duty not to submit it to the jury. . . . Thus, a trial court should instruct the jury in accordance with a party's request to charge [only] if the proposed instructions are reasonably supported by the evidence. . . .

"It is well established that a defendant has a right to introduce evidence that indicates that someone other

than the defendant committed the crime with which the defendant has been charged. . . . The defendant must, however, present evidence that directly connects a third party to the crime. . . . It is not enough to show that another had the motive to commit the crime . . . nor is it enough to raise a bare suspicion that some other person may have committed the crime of which the defendant is accused. . . .

"Because the standards governing the admissibility of third party culpability evidence require that the trial court determine that such evidence be relevant to the jury's determination of whether a reasonable doubt exists as to the defendant's guilt, we conclude that those same standards should govern whether a trial court should give an appropriate instruction on third party culpability. Put another way, if the evidence pointing to a third party's culpability, taken together and considered in the light most favorable to the defendant, establishes a direct connection between the third party and the charged offense, rather than merely raising a bare suspicion that another could have committed the crime, a trial court has a duty to submit an appropriate charge to the jury. . . . The trial court's determination as to whether evidence of third party culpability is relevant and probative is subject to review for an abuse of discretion." (Citations omitted; internal quotation marks omitted.) *State* v. *Jackson*, 304 Conn. 383, 423–24, 40 A.3d 290 (2012).

The following additional facts are relevant to our consideration of the defendant's claim. In addition to the fingerprints on the outside of the grey Ford Focus that were attributable to the defendant and to James Walker, Jr., five additional fingerprints were lifted from the vehicle that were not identifiable as belonging to either the defendant or to James Walker, Jr. Further, the DNA sample collected from the baseball cap was a mixed sample, meaning that more than one person

had contributed to the DNA profile of the sample tested. The forensic scientist who testified at trial stated that as many as four individuals may have contributed DNA to the sample tested, although she also testified that the defendant's DNA was the major contributor to the DNA profile.

Following the close of evidence and prior to closing arguments, the defendant stated that he believed that some of the physical evidence presented by the state provided a "circumstantial basis" for an instruction to the jury on the defense of third party culpability.[3] The defendant wanted the court to instruct the jurors that they could infer on the basis of the five unidentified fingerprints lifted from the Ford Focus and the presence of DNA on the baseball cap from persons other than the defendant that someone other than the defendant had committed the crimes charged. The court denied the defendant's request to give the instruction on third party culpability because it found that the defendant had failed to meet his burden of showing the existence of direct evidence of a third party perpetrator. The court found that the proffered DNA and fingerprint evidence was totally speculative with regard to the existence of a third party perpetrator and did not rise to the level of direct evidence necessary to warrant an instruction on third party culpability, adding, "and that's aside from the question of principal or accessory liability."

We cannot conclude that the court abused its discretion in refusing to give a third party culpability instruction based on the evidence offered by the defendant to support such an instruction. The proffered evidence was never directly linked to an identifiable third person or group of persons, and, as the defendant himself elicited during his cross-examination of the witnesses that

---

[3] The defendant's counsel stated that "while there's no direct evidence of third party culpability, absolutely there is circumstantial evidence that would suggest that there is, at the very least, a possibility."

testified about the fingerprint and DNA evidence, there is no way to know, from the evidence alone, when or in what sequence in relation to the commission of the crimes charged, the evidence was placed on the automobile or in the cap. See *State* v. *West*, 274 Conn. 605, 626–27, 877 A.2d 787 (court properly excluded unidentified latent prints as evidence of third party perpetrator where prints located at periphery of crime scene, nothing in record indicated when prints placed relative to commission of offenses and nothing linked prints to particular individual or class of individuals), cert. denied, 546 U.S. 1049, 126 S. Ct. 775, 163 L. Ed. 2d 601 (2005). The proffered unidentified latent fingerprint evidence in the present case was not collected within close proximity to where the crime occurred, and, unlike the cell phone evidence that aids in connecting the defendant's fingerprint to his presence inside the vehicle, there is no such evidence connecting the proffered fingerprint evidence with the crime.

Further, even if the proffered fingerprint and DNA evidence was direct evidence of the presence of a third party, in the present case, in which it is not disputed on appeal that the crime was committed by multiple perpetrators, evidence of the additional fingerprints and DNA would not necessarily raise a reasonable doubt about the guilt of the defendant to the degree that it might have if the charged crime had been prosecuted on a theory that it was committed by a single perpetrator. Nothing in the presentation of the evidence by the state in the present case forecloses the possibility that there may have been additional accessories or coconspirators that came in contact with the vehicle or the baseball cap. We agree with the state that because, when viewed in a light most favorable to the defendant, the proffered DNA and fingerprint evidence only indirectly and tenuously implicated third parties without directly absolving or exculpating the defendant, the court did not abuse

its discretion by refusing to give a third party culpability instruction.

### III

Finally, the defendant claims that pervasive improprieties during the prosecutor's initial and rebuttal closing arguments to the jury deprived him of his due process right to a fair trial.[4] The defendant divides his claim regarding the prosecutor's alleged improprieties into five sections. Specifically, the defendant argues that the prosecutor improperly (1) expressed his opinion regarding the defendant's guilt, (2) speculated about a possible motive for the shooting that was contrary to the testimony of one of the victims, (3) attempted to evade a court ruling that the jury should not consider certain hearsay testimony for its truth, (4) stated facts that had no foundation in the evidence and (5) impugned the defendant's counsel and the defense tactics by excessive use of sarcasm. The state argues that the challenged arguments "were altogether proper" and

---

[4] The defendant concedes that he failed to object during trial to any of the alleged improprieties, nor did he seek any curative instruction from the court or ask for a mistrial. Nevertheless, "[a]lthough the defendant has not preserved . . . the claims of [impropriety] that he now raises on appeal, our Supreme Court has held that a defendant who fails to preserve claims of prosecutorial [impropriety] need not seek to prevail under the specific requirements of *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989). . . . The consideration of the fairness of the entire trial through the [*State* v. *Williams*, 204 Conn. 523, 540, 529 A.2d 653 (1987)] factors duplicates, and, thus makes superfluous, a separate application of the *Golding* test. . . . This does not mean, however, that the absence of an objection at trial does not play a significant role in the application of the *Williams* factors. To the contrary, the determination of whether a new trial or proceeding is warranted depends, in part, on whether defense counsel has made a timely objection to any [incident] of the prosecutor's improper [conduct]. When defense counsel does not object, request a curative instruction or move for a mistrial, he presumably does not view the alleged impropriety as prejudicial enough to seriously jeopardize the defendant's right to a fair trial." (Citation omitted; internal quotation marks omitted.) *State* v. *Edward M.*, 135 Conn. App. 402, 411 n.4, 41 A.3d 1165, cert. denied, 305 Conn. 914, 46 A.3d 172 (2012).

that the prosecutor simply was "mining the evidence for all that it could permissibly yield." Our careful review of the entirety of the closing arguments reveals no improprieties on the part of the prosecutor and, accordingly, no due process violation.

"[I]n analyzing claims of prosecutorial [impropriety], we engage in a two step analytical process. The two steps are separate and distinct: (1) whether [impropriety] occurred in the first instance; and (2) whether that [impropriety] deprived a defendant of his due process right to a fair trial. . . . [O]ur determination of whether any improper conduct by the state's attorney violated the defendant's fair trial rights is predicated on the factors set forth in *State* v. *Williams* [204 Conn. 523, 540, 529 A.2d 653 (1987)], with due consideration of whether that [impropriety] was objected to at trial. . . . These factors include the extent to which the [impropriety] was invited by defense conduct or argument . . . the severity of the [impropriety] . . . the frequency of the [impropriety] . . . the centrality of the [impropriety] to the critical issues in the case . . . the strength of the curative measures adopted . . . and the strength of the state's case. . . .

"[W]hen a defendant raises on appeal a claim that improper remarks by the prosecutor deprived the defendant of his constitutional right to a fair trial, the burden is on the defendant to show, not only that the remarks were improper, but also that, considered in light of the whole trial, the improprieties were so egregious that they amounted to a denial of due process." (Citations omitted; internal quotation marks omitted.) *State* v. *Kurrus*, 137 Conn. App. 604, 618–19, 49 A.3d 260, cert. denied, 307 Conn. 923, 55 A.3d 566 (2012).

A

The defendant first argues that the prosecutor, "with great frequency, commented on guilt and his personal

view of the evidence . . . ."[5] On the basis of our careful

[5] The defendant cites the following specific excerpts from the prosecutor's argument, in particular the italicized passages, as statements in which he believes the prosecutor impermissibly expressed his personal opinion regarding either the defendant's guilt or the evidence.

In discussing the grey Ford Focus rented by Jamie Walker, the prosecutor stated: "The car was due back on September 19, but of course we know that that didn't happen because *when the defendant and Mr. Walker left it in the driveway*, it was seized by the New Haven Police and had to be processed for physical evidence."

The prosecutor discussed the testimony of the firearms examiner, stating in part: "Additionally, there was another projectile recovered from the bedroom. He determined that that was fired [from] a .44 Special Charter Arms revolver *which absolutely proves in this case that there were in fact two guns used to do this shooting, which is consistent with the state's claim that there were two shooters in this case.*"

In discussing the chain of evidence that linked the Ford Focus rented by Jamie Walker to the shooting and the steps taken by the detectives to investigate the operator of the vehicle, which included interviewing Jamie Walker on the basis of the rental agreement found inside the car, the prosecutor stated: "Detective Wuchek and Detective Dadio know, and you should know by now, that this—*there is no question that this is the automobile that was used in this shooting.*"

In rebutting a defense argument as it related to the location of the defendant's fingerprints on the hood of the Ford Focus found at 55 Diamond Street, the prosecutor stated: "[Y]eah, it is true that the car was parked with the hood towards the front of the garage area, *and that certainly wouldn't have been the direction that [the defendant] ran.* But you forget one thing here: *He got in and out of that car over at 429 Dixwell Avenue, and before he got over to 429 Dixwell Avenue he got in and out of that car too.* So what's happening? Doesn't prove anything other than the fact that his prints are on that car. . . . Now, it's a reasonable inference and a logical conclusion on your part to think that during the week [the defendant] had some contact with his girlfriend and she had the car. *Maybe he got in and out. But he would have had an opportunity to have some contact with that car a week before and the evening of the shooting. That's the only evidence you have.* You can't speculate about anything else."

In responding to the defense's argument concerning a lack of a motive for the shooting and the testimony of Pouncey that he had known the defendant for about ten years and that they were "cool," the prosecutor remarked: "*And as far as motive is concerned, [Pouncey] thought that he was friendly with [the defendant]. Obviously, that wasn't true,* but whether or not a person has a motive to hurt somebody, to shoot somebody, you can't look into another person's mind and figure out what their motivation is."

In his rebuttal argument, after explaining the chain of evidence linking the grey Ford Focus rented by Jamie Walker and found at 55 Diamond

review of the closing arguments, we do not agree with the defendant's assessment that the prosecutor's arguments were improper.

"[P]rosecutorial [impropriety] of a constitutional magnitude can occur in the course of closing arguments. . . . In determining whether such [impropriety] has occurred, the reviewing court must give due deference to the fact that [c]ounsel must be allowed a generous latitude in argument, as the limits of legitimate argument and fair comment cannot be determined precisely by rule and line, and something must be allowed for the zeal of counsel in the heat of argument. . . . Thus, as the state's advocate, a prosecutor may argue the state's case forcefully, [provided the argument is] fair and based upon the facts in evidence and the reasonable inferences to be drawn therefrom. . . . Moreover, [i]t does not follow . . . that every use of rhetorical language or device [by the prosecutor] is improper. . . . The occasional use of rhetorical devices is simply fair argument. . . . Nevertheless, the prosecutor has a heightened duty to avoid argument that strays from the evidence or diverts the jury's attention from the facts of the case. . . .

"It is well established that [a] prosecutor may not express his own opinion, directly or indirectly, as to the credibility of the witnesses. . . . Nor should a prosecutor express his opinion, directly or indirectly, as to the guilt of the defendant. . . . Such expressions of personal opinion are a form of unsworn and unchecked testimony, and are particularly difficult for the jury to ignore because of the prosecutor's special position. . . . Moreover, because the jury is aware that the prosecutor has prepared and presented the case and consequently, may have access to matters not in evidence

Street to the shooting, the prosecutor stated: *"There's no doubt that that car was used by the shooters."* (Emphasis added.)

. . . it is likely to infer that such matters precipitated the personal opinions. . . . *It is not, however, improper for the prosecutor to comment upon the evidence presented at trial and to argue the inferences that the jurors might draw therefrom.*" (Citation omitted; emphasis added; internal quotation marks omitted.) *State* v. *Gibson,* 302 Conn. 653, 659–60, 31 A.3d 346 (2011).

In the present case, in which the prosecutor was attempting to establish the defendant's presence at the scene of the crime by means of a chain of inferred facts, it was necessary and proper for the prosecutor to discuss in his closing argument those reasonable factual inferences that the state asked the jury to draw from the circumstantial evidence presented at trial and that the prosecutor believed supported the state's theory of the case. A prosecutor is not expressing his personal opinion when he or she states factual evidence and reasonable inferences tending to support a finding that the defendant is guilty. On the basis of our review of the statements that the defendant alleges were improper, reading them within the full context of the surrounding arguments and giving generous latitude, as we must, for the zeal of counsel and the state's right forcefully to present its case, we cannot conclude that the arguments and rhetorical language used by the prosecutor strayed from a fair and fact-based presentation of the evidence and the reasonable inferences to be drawn therefrom into impermissible expressions of the prosecutor's personal opinion regarding the defendant's guilt.

B

The defendant next argues that the prosecutor improperly "argued contrary to the testimony of the victim and implied that the defendant had motive because he was the shooter." The defendant contends

that the prosecutor's remarks were not invited and that they amounted to speculation or suggested inferences unconnected to the evidence. We do not agree that the prosecutor's rebuttal argument pertaining to motive was improper.

The following additional facts are relevant to this claim. Pouncey, one of the two victims, was asked by the state at trial whether he knew the defendant or James Walker, Jr. He stated that he had heard of both. He also testified that James Walker, Jr., lived nearby and had been to his house because he used to be friends with Pouncey's brother. As to the defendant, he testified that he was "his friend from a long time ago," explaining on cross-examination that he had known him for approximately ten years. Pouncey also testified that he and the defendant "never had no problems or nothing like that," either before or after the shooting at issue.

In his closing remarks to the jury, the defendant's counsel recounted Pouncey's testimony that Pouncey had known the defendant for ten years and that there were no problems between them before or after the shooting. Counsel continued: "There was no reason for [the defendant] to shoot [Pouncey]. And while motive is not an element in any offense, lack of a motive can actually give rise to reasonable doubt."

In rebutting defense counsel's argument regarding an apparent lack of motive, the prosecutor made, in part, the following statement: "And [as] far as motive is concerned, [Pouncey] thought that he was friendly with [the defendant]. Obviously, that wasn't true, but whether or not a person has a motive to hurt somebody, to shoot somebody, you can't look into another person's mind and figure out what their motivation is. Obviously, things are done—usually done for some reason."

Because the defendant raised the issue of motive and the nature of the relationship between the defendant

and Pouncey in his argument to the jury, the prosecutor was entitled to rebut the defendant's argument, and our review of the argument as a whole leads us to conclude that, contrary to the defendant's claim, the prosecutor did not "invite sheer speculation unconnected to the evidence" nor did he "suggest inferences from facts not in evidence." The prosecutor, in his initial argument, already had marshaled the evidence from which the state contended the jury reasonably could infer that the defendant and James Walker, Jr., were the perpetrators of the shooting. With that evidentiary foundation already in place, it was not improper for the prosecutor to suggest that the jury could make an additional logical inference, namely that a person who shoots another likely is not friendly with that person, and, therefore, the jury was entitled to disbelieve Pouncey's statement that he and the defendant were friends and there were no problems between them. In stating that Pouncey's statement was not true, the prosecutor was not necessarily expressing his personal opinion about the evidence or Pouncey's credibility; rather, he was asking the jury to consider the reasonableness of Pouncey's statement in light of the other evidence presented by the state. We find no impropriety in the challenged argument.

## C

The defendant next argues that the prosecutor attempted to evade and undermine a court ruling that the jury not consider certain hearsay testimony for its truth. We disagree.

The following additional facts are necessary to understand the defendant's argument. One of the witnesses called by the state to testify in this matter was Detective Michael Wuchek. Wuchek testified on direct examination that, as part of the investigation, he had occasion to interview Jamie Walker because, on the basis of

the rental agreement found inside the vehicle, she was determined to be the renter of record of the grey Ford Focus found at 55 Diamond Street, and he wanted to ask her whether she was in possession of the vehicle at the time of the shooting. The following colloquy occurred between Wuchek and the prosecutor:

"Q. Did you ask her that?"

"A. Yes, I did.

"Q. Did she give you some information concerning that?

"A. Yes.

"Q. And as a result of that, who did you go looking for?

"A. [The defendant].

"Q. Her boyfriend?

"A. Yes.

"Q. To your knowledge in investigating this situation, had that Ford Focus automobile ever been reported stolen?

"A. No."

On cross-examination and recross, the defendant elicited testimony from Wuchek, attempting to show a lack of evidence placing the defendant inside the Ford Focus around the time of the shooting, ultimately asking: "Do you have any evidence, fingerprints, forensic, hair, anything like that that puts [the defendant] inside the car or somebody saying I saw him driving it?" Wuchek responded in the negative. On redirect, the following colloquy occurred between Wuchek and the prosecutor:

"Q. Detective Wuchek, when you were interested in finding out who had that vehicle the night of the shooting, did you go see Jamie Walker?

"A. Yes, I did.

"Q. And she's his—[the defendant's] girlfriend, right?

"A. Yes.

"Q. And earlier you said that you didn't—did you have information from her as to whether or not [the defendant] was driving the car?

"A. Yes. She said that she gave it to him."

The defendant objected that Wuchek's final statement was hearsay. The prosecutor attempted to suggest that the response was proper because of the defendant's line of questioning that Wuchek had absolutely no information that the defendant had been driving the vehicle. After a sidebar with counsel, however, the court issued the following limiting instruction: "Whatever information this witness got from Jamie Walker about who had the car [is] not offered for its truth. You can't find any facts from it. *It's just offered to show what he did in the course of his investigation in response to getting that information.* Understood? Whatever she said, you can't find facts from it. It's not admitted for its truth, but only to explain what he did as a follow up." (Emphasis added.) The court repeated this same limiting instruction in its instructions to the jury after closing arguments.

We now to turn to the defendant's argument that, in closing arguments, "rather than using Wuchek's testimony as the court permitted, the prosecutor related the content of Jamie Walker's hearsay, out-of-court information." In his initial closing argument, the prosecutor stated: "So they ask the defendant's girlfriend, Jamie Walker, about who had the car the night of the shooting? She gives them information. What happens after that? Detective Wuchek and Detective Dadio go looking for [the defendant] based on the information that's been given to them by the defendant's girlfriend,

Jamie Walker." In his rebuttal argument, the prosecutor again highlighted the same sequence of events, stating: "Right after the police find out that Jamie Walker, the defendant's girlfriend, rented that car, they went to her and asked her who had the car on the night of the shooting. Any one of you would have done the same thing; that's the most logical thing you would do. And immediately after they speak with her, they go looking for the defendant." In its limiting instruction, the court indicated that the jury was prohibited from using Jamie Walker's statements to the police as the basis for a factual finding that the defendant was in possession of the grey Ford Focus, and that the information provided by Jamie Walker could only be used to show what Wuchek did in the course of his investigation in response to receiving that information.

Our review of the prosecutor's remarks reveals that he did not stray outside of the confines of the court's limiting instruction. The prosecutor never restated Jamie Walker's out of court statement, nor did he paraphrase the information contained therein. He limited his remarks to the evidence that the jury was permitted to consider pursuant to the court's limiting instruction, namely, that Wuchek had questioned Jamie Walker about who had the Ford Focus on the night of the shooting and that the information she provided led the detectives to seek out and to question the defendant. Absent clear evidence to contrary, we presume that the jury followed the court's limiting instructions; see *State* v. *Anderson*, 86 Conn. App. 854, 870, 864 A.2d 35, cert. denied, 273 Conn. 924, 871 A.2d 1031 (2005); and we cannot conclude that the prosecutor's remarks were intended to induce the jury to do otherwise. We find no impropriety in the challenged remarks.

D

The defendant next argues that the prosecutor stated facts that had no foundation in the evidence. Having

reviewed the challenged statements, we find no merit to this argument, and we will not engage in an exhaustive discussion of each challenged statement. As previously noted, although the prosecutor certainly is not permitted to suggest facts that are not in evidence, it is not improper for the prosecutor to comment upon the evidence "and to argue the inferences that the jurors might draw therefrom." (Internal quotation marks omitted.) *State* v. *Gibson,* supra, 302 Conn. 660. In referring to facts that properly may be inferred from the evidence, the prosecutor is not impermissibly speculating about facts not in evidence.

## E

Finally, the defendant argues that the prosecutor impugned the defendant's counsel and the defense tactics by excessive use of sarcasm. The defendant points to several instances in closing arguments when, in responding to defense arguments, in particular arguments regarding the existence of unexplained third party forensic evidence and perceived insufficiencies in the state's evidence, the prosecutor remarked "who cares," "so what," "What does that mean? Not a heck of a lot . . ." or "big deal." The defendant also points to one instance in which the prosecutor stated: "If you believe that, well, you know there's a bridge in New York for sale."

"[T]he prosecutor is expected to refrain from impugning, directly or through implication, the integrity or institutional role of defense counsel. . . . There is a distinction [however] between argument that disparages the integrity or role of defense counsel and argument that disparages a theory of defense. . . . Moreover, not every use of rhetorical language is improper. . . . There is ample room, in the heat of argument, for the prosecutor to challenge vigorously the arguments made by defense counsel." (Citations omitted; internal quotation marks omitted.) *State* v.

*Outing*, 298 Conn. 34, 82–83, 3 A.3d 1 (2010), cert. denied, 562 U.S. 1225, 131 S. Ct. 1479, 179 L. Ed. 2d 316 (2011).

Although excessive use of sarcasm that evinces a prosecutor's personal disdain for the defendant's counsel or a testifying witness certainly may call into question the professionalism of the prosecutor and may even rise to the level of impropriety, some use of sarcastic and informal language, when intended to forcefully criticize a defense theory on the permissible bases of the evidence and the common sense of the jury, is not necessarily improper. See *State* v. *Rolli*, 53 Conn. App. 269, 281, 729 A.2d 245 (counsel properly may appeal to jury's common sense in closing remarks), cert. denied, 249 Conn. 926, 733 A.2d 850 (1999). Our review of the challenged instances of sarcasm in the present case reveal that they fall within the latter category. In each instance, the prosecutor's remark was linked to a discussion of the evidence that the state believed rendered a particular defense argument invalid. We do not view the prosecutor's challenged remarks in the present case as inviting the jury "to decide the case on its emotions rather than on a rational appraisal of the evidence." See *State* v. *Medrano*, 131 Conn. App. 528, 547, 27 A.3d 52, cert. granted, 303 Conn. 912, 32 A.3d 965 (2011). In sum, when viewed in the full context of the surrounding arguments, we are not persuaded that the prosecutor committed any impropriety in delivering his closing arguments to the jury.

The judgment is affirmed.

In this opinion the other judges concurred.