******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* KELVIN DAYE
(AC 37160)

DiPentima, C. J., and Keller and Mullins, Js.

*Argued May 11—officially released September 15, 2015*

(Appeal from Superior Court, judicial district of
Hartford, Vitale, J.)

*Daniel J. Krisch*, assigned counsel, for the appellant (defendant).

*Timothy J. Sugrue*, assistant state's attorney, with
whom, on the brief, were *Gail P. Hardy*, state's attorney, and *David L. Zagaja*, senior assistant state's attorney, for the appellee (state).

*Opinion*

KELLER, J. The defendant, Kelvin Daye, appeals from the judgment of conviction, following a jury trial, rendered by the trial court on one count of capital felony in violation of General Statutes (Rev. to 2003) § 53a-54b (5). He claims that prosecutorial improprieties occurred during the state's initial closing and rebuttal arguments that deprived him of his right to a fair trial. We affirm the judgment of the court.

The following facts, which the jury reasonably could have found, and procedural history are relevant here. In July, 2004, the victim, Trupti Patel, and her husband lived in an apartment complex located in East Hartford. At that time, both of them worked for the same company in East Windsor. The victim and her husband both were working during the early morning hours of July 9, 2004. At approximately 1:30 a.m., the victim completed her work shift and left her place of employment after informing her husband, who was in the middle of his work shift, that she was going home and that she did not have to attend classes for school later that morning.

At some point in time after returning to the apartment complex on July 9, 2004, the victim came across the defendant and a violent encounter ensued between them. During the encounter, the defendant broke a window on a locked door leading to the basement of the apartment complex, reached through the hole in the window, opened the door from the inside, and forced the victim into the basement. He shot the victim three times in her head, wrapped a garbage bag around her head, tied a rope and duct tape around the bag, and left her naked from the waist down in the furnace room of the basement.

The victim's husband ended his work shift at approximately 6 a.m. on July 9, 2004, and arrived at the apartment complex at approximately 6:30 a.m. that morning. The victim was not in their apartment, although her car was parked in the apartment complex's parking lot. The victim's husband checked the apartment complex's gymnasium, but he found that it was closed. He proceeded to call one of the victim's friends from school, one of his friends who lived in the same apartment complex, and the victim's brother, but none of them had heard from the victim. He then called the police and filed a missing person's report.

Later that evening, a number of friends of the victim's husband visited him at his apartment to offer him company and support. They decided to look around the apartment complex for any clues as to the victim's whereabouts. At approximately 2 a.m. on July 10, 2004, while searching the apartment complex, one of the friends of the victim's husband noticed that the window on the basement door was broken. The victim's husband called the police to report the broken window.

Following the victim's husband's call, Adam Aborn, a patrol officer for the East Hartford Police Department, was dispatched to the apartment complex. The victim's husband led him to the basement door with the broken window. Aborn noticed what appeared to be a small amount of blood located on the floor beyond the door. The door was locked, so Aborn called a property management employee to unlock the door. After the door was unlocked and opened, Aborn observed a large pool of dried blood at the base of the door. Within the pool of blood was a pair of eyeglasses that the victim's husband identified as belonging to the victim. Aborn directed the victim's husband to remain outside of the doorway while he, along with another police officer who had arrived at the scene, ventured into the basement.

Past the basement door was a dimly lit hallway approximately 100 yards long. Aborn observed a long, continuous blood trail leading down the hallway, as well as blood stains on the walls. About halfway down the hallway was another door, which had blood smeared on it. Aborn went through the doorway and observed that the blood trail continued, uninterrupted, to another door ahead of him that led into the furnace room.[1] He then entered the furnace room and discovered the victim's body.

Subsequently, additional police officers arrived to secure and process the crime scene. The investigating officers discovered the following relevant pieces of evidence: (1) blood on the broken window; (2) blood on a lightbulb in the hallway leading to the furnace room; (3) an unwrapped condom; (4) one unfired .22 caliber bullet and two fired .22 caliber shell casings; and (5) one pair of women's pants and one pair of women's underwear.[2] Scientists at the state forensic laboratory determined that various blood samples retrieved from the crime scene contained a DNA profile that did not belong to the victim. Consequently, the unidentified DNA profile was entered into a national database to search for potential matches.

Several years later, on July 1, 2010, the state forensic laboratory notified the East Hartford Police Department that the unidentified DNA profile collected from the crime scene matched the DNA profile of the defendant, which had been entered into the database on June 19, 2009. On September 15, 2010, Ellen Stoldt, a detective with the East Hartford Police Department, executed a search warrant on the defendant, who was being detained at the Immigration and Customs Enforcement office in Hartford, and obtained samples of his saliva, fingerprints, and palm prints. Stoldt then read to the defendant his *Miranda* rights,[3] which he waived. She proceeded to inform him that his blood had been found at a crime scene in East Hartford and that a woman, whom she did not identify, had been the victim of a crime, although she did not specify that the woman had

been killed. The defendant stated that he did not commit any crimes in East Hartford, and asked Stoldt why anyone would have wanted to kill the woman. When asked how he knew that a homicide had occurred, he began to sweat and rock back and forth in the chair in which he was sitting.

Subsequently, the state forensic laboratory confirmed that several blood samples found at the crime scene belonged to the defendant. Further analysis also determined that the defendant's DNA was present on the inside and outside of the condom found at the crime scene, and that the defendant, or a member of the same paternal lineage, could not be eliminated as the source of DNA found on the inside and outside of the women's pants and underwear found at the crime scene.

The defendant was arrested and charged with six counts: in count one he was charged with murder in violation of General Statutes § 53a-54a; in count two he was charged with sexual assault in the first degree in violation of General Statutes § 53a-70 (a) (1); in count three he was charged with kidnapping in the first degree in violation of General Statutes § 53a-92 (a) (2) (A); in count four he was charged with capital felony in violation of General Statutes (Rev. to 2003) § 53a-54b (6);[4] in count five he was charged with capital felony in violation of General Statutes (Rev. to 2003) § 53a-54b (5);[5] and in count six he was charged with felony murder in violation of General Statutes § 53a-54c.

The case was tried to a jury. The defendant did not testify. During the trial, the state introduced evidence connecting the defendant, through DNA analysis, to the condom, the victim's pants and underwear, and various blood samples located at the crime scene. Furthermore, the state elicited testimony from Carmen Bournes, a woman with whom the defendant had been involved romantically from May, 2002, to 2005 or 2006, and with whom he had fathered a child. Bournes testified as to the following. One night, the defendant and Bournes were watching television. The defendant seemed upset and told her that he had an incident with a woman that had gone "bad." He stated to her that he had broken a window to get into a basement, and that the woman had "put up a fight." He also mentioned that a woman had been killed, and he pointed at the television screen and stated to Bournes, "I told you, see, I told you," when news coverage of the victim's death was being broadcasted. He also told Bournes that an Indian woman had been haunting him. Subsequently, at some point in 2004 or 2005, the defendant showed Bournes a pocketbook that was wet. Inside the pocketbook were documents, including one that appeared to be a passport. The defendant told Bournes that the pocketbook "was hers," which Bournes believed was in reference to the woman who had been killed.[6]

The jury found the defendant guilty on counts one,

three, five, and six, but not guilty on counts two or four. The court, *Vitale, J.*, sentenced the defendant to life in prison without the possibility of release on count five and, pursuant to *State* v. *Polanco*, 308 Conn. 242, 61 A.3d 1084 (2013), vacated the other three convictions.[7] This appeal followed. Additional facts will be set forth as necessary.

The defendant claims that the prosecutor made improper comments during the state's initial closing and rebuttal arguments and, as a result, he was deprived of his right to a fair trial. Specifically, the defendant asserts that, during the state's initial closing argument, the prosecutor improperly appealed to the jurors' emotions, provided the jurors with his personal opinion of the evidence, and made an improper "golden rule" argument. Furthermore, he contends that, during the state's rebuttal argument, the prosecutor improperly denigrated his defense and defense counsel's integrity. We disagree and conclude that all of the comments challenged by the defendant were proper.

We begin by setting forth the relevant standard of review. "In analyzing claims of prosecutorial impropriety, we engage in a two step analytical process. . . . The two steps are separate and distinct. . . . We first examine whether prosecutorial impropriety occurred. . . . Second, if an impropriety exists, we then examine whether it deprived the defendant of his due process right to a fair trial. . . . In other words, an impropriety is an impropriety, regardless of its ultimate effect on the fairness of the trial. Whether that impropriety was harmful and thus caused or contributed to a due process violation involves a separate and distinct inquiry. . . . An appellate court's determination of whether any improper conduct by the prosecutor violated the defendant's right to a fair trial is predicated on the factors established in *State* v. *Williams*, 204 Conn. 523, 540, 529 A.2d 653 (1987). Those factors include the extent to which the [impropriety] was invited by defense conduct or argument . . . the severity of the [impropriety] . . . the frequency of the [impropriety] . . . the centrality of the [impropriety] to the critical issues in the case . . . the strength of the curative measures adopted . . . and the strength of the state's case. . . . [If] a defendant raises on appeal a claim that improper remarks by the prosecutor deprived the defendant of his constitutional right to a fair trial, the burden is on the defendant to show . . . that the remarks were improper . . . .

"As [our Supreme Court] previously [has] recognized, prosecutorial [impropriety] of a constitutional magnitude can occur in the course of closing arguments. . . . When making closing arguments to the jury, [however] [c]ounsel must be allowed a generous latitude in argument, as the limits of legitimate argument and fair comment cannot be determined precisely by rule and line,

and something must be allowed for the zeal of counsel in the heat of argument. . . . Thus, as the state's advocate, a prosecutor may argue the state's case forcefully, [provided the argument is] fair and based upon the facts in evidence and the reasonable inferences to be drawn therefrom. . . .

"Nevertheless, the prosecutor has a heightened duty to avoid argument that strays from the evidence or diverts the jury's attention from the facts of the case. [The prosecutor] is not only an officer of the court, like every attorney, but is also a high public officer, representing the people of the [s]tate, who seek impartial justice for the guilty as much as for the innocent. . . . By reason of his office, he usually exercises great influence upon jurors. His conduct and language in the trial of cases in which human life or liberty [is] at stake should be forceful, but fair, because he represents the public interest, which demands no victim and asks no conviction through the aid of passion, prejudice, or resentment. If the accused [is] guilty, he should [nonetheless] be convicted only after a fair trial, conducted strictly according to the sound and well-established rules which the laws prescribe. While the privilege of counsel in addressing the jury should not be too closely narrowed or unduly hampered, it must never be used as a license to state, or to comment upon, or to suggest an inference from, facts not in evidence, or to present matters which the jury ha[s] no right to consider. . . .

"Claims involving prosecutorial impropriety during the course of closing argument[s] require a court to evaluate a prosecutor's statements not for their possible meaning, but for the manner in which the jury reasonably and likely would have understood them. Because the meaning of words and statements typically is dependent on the context in which they are used, a court must carefully consider a prosecutor's challenged statements by carefully considering their context in the entire trial, including the remainder of the state's closing argument[s]." (Internal quotation marks omitted.) *State* v. *LaVoie*, 158 Conn. App. 256, 274–76,      A.3d      (2015).

We proceed to set forth the following additional relevant facts. During the state's initial closing argument, the prosecutor made the following comments in relevant part: "*In your minds go to [the apartment complex] on July 10, 2004, enter the door just as any other individual did, Officer [Michael] Romano [an investigating police officer], anyone else from the East Hartford police, and consider what was there, consider what you saw. Now, when you get over the horror and the shock and everything that comes with what contributed to that woman's death, step back.* Step back and do a walk-through from that back doorway, come through the door, go down the stairs and stand there, stand there in the landing area before you enter the basement hallway. Look up. See a broken light. Look at

the door. See a broken window with glass and apparent pieces of the light fixture there in that landing area. Go through the door and look down the hallway and be struck by how dark it is. And then look through the hallway and see five fluorescent lightbulbs throughout the hallway; other lightbulbs that are still in their fixtures but not working. And then observe blood throughout the entire hallway.

"You find a bullet. You find a condom. You find a pair of glasses right at the doorway. You walk through a middle door and you still perceive. You find a carriage with pants and underpants attached in a side hallway area. And then continue straight down the hall and enter what's labeled as a sprinkler room, *and you find a bloodbath, and you also find a dead woman who is naked from the waist down.*

"The reason I ask you to do that and consider all of that is because your arrival at that scene and everything you see in that scene up to the discovery of [the victim] enables you to all determine from that day that all six charges that I've presented have been proven beyond all doubt. . . .

"Two counts of capital felony. [The victim] was murdered in the course of a kidnapping, *she was ambushed when she came home from work*, and forced down that hallway that was estimated to be about 300 feet long, 100 yards long. She was kidnapped. She was murdered in the course of a kidnapping.

"Second count, capital felony. [The victim] was murdered in the course of a sexual assault. *You find this woman, she's naked from the waist down.* . . .

"The lab processed pieces of evidence. They entered into a database. Still no identity of who contributed to all these things until June, 2009, when [the defendant] was placed into the database. And there you have it.

"But you don't have it on one piece of evidence; you have it on so many pieces of evidence. The broken glass, forcing entry into that basement area, *lying in wait for* [*the victim*]. As I stand here today, I cannot tell you, and I don't know if you can determine from the evidence, was [the victim] targeted? Was she the one he wanted or was any potential person coming through that doorway going to be the target? It's not clear and certainly nothing's been presented to you to say that he was looking at her for some period of time. . . .

"With the DNA evidence, with the forensic evidence, you have a clearer picture that does nothing to contradict what your first observation should be about that scene. *The darkness, the lying in wait, the ambush, the removal of lightbulbs.* The defendant's blood, the DNA profile that fits that of the defendant was found on the glass from that door. Same profile was found in the blood on the unilluminated lightbulb as you first

enter. A drop of blood in that doorway had a DNA profile that fit the defendant. Another bloodstain by the metal door fit the defendant. Another bloodstain in the sprinkler room where [the victim's] body was found fit the defendant. . . .

"Ladies and gentlemen, there really is no escapable conclusion you can draw from all of the evidence and consideration of all of the evidence, entertain,—and I don't mean that in a trite way—consider everything that needs to be considered. But when you do consider all of that, you will always come back to one conclusion: It's first based on looking at the evidence without even consideration to that man. Again, you know everything that happened and the only issue is—and the who is resolved. *You literally look at the scene and say, Oh my God,* but, again, after you step back, and as we asked you during jury selection, can you set those issues aside, can you set any issues of emotion aside and to the best of your ability objectively assess the evidence. When you do, there's no escapable issue. There's one conclusion. Thank you, ladies and gentlemen." (Emphasis added.)

Defense counsel presented his closing remarks after the conclusion of the prosecutor's initial closing argument. In essence, defense counsel argued that someone other than the defendant had killed the victim and, for unknown reasons,[8] the defendant had broken into the basement, discovered the victim's body and left the scene, leaving his DNA in the process.

The prosecutor then offered the following remarks in rebuttal: "*I only thought I'd say oh my God once.* Ladies and gentlemen, closing argument is not a question and answer time. But of course there is one burning question now: Why did [the defendant] need to trespass? Why did he need to break into that hallway area, if that's being conceded? There's nothing there. You saw that. And he doesn't even live there, he lives in East Hampton. He's a good guy who has a nice home and a wife and kids. Answer that question. You've been presented with that hypothetical. If it has a reasonable answer, if it has a reason by which he needed to trespass or was trespassing, *then get on that bus and ride the trip that* [*defense counsel*] *asks you to take.*

"East Hartford police tried to nail down an approximate time frame as to when this happened and they were looking to match that time frame up and speak with various people. Is that the begin all and end all of when [the victim] was actually killed? No. There was no camera at that doorway when she got ambushed, but she certainly was ambushed.

"*It's just amazing.* You're asked to consider [the defendant's] DNA dropping on the condom. Remember, the limited mixture without robust profiles was on the outside of the condom. The robust complete profile of

that man was from the inside of the condom. Of course, through the alternative light and analysis conducted on the body of [the victim], nothing was found on her body. Maybe because the assailant had a condom.

"And the pants. The pants are the ultimate connection to the sexual assault, to the attack, to the killer of [the victim], inside and outside. So that means that that errant blood coming from [the defendant] managed to get on the inside of the pants and the outside of the pants. *Everyone scratch their heads now*.

"And you know what's incredible about Carmen Bournes, you saw her. You know, I often take to heart what the judge says about considering the testimony of individuals and he said this during the beginning. You'd be called upon to assess someone's testimony no matter what walk of life they may come from. They could be a scientist, they could be a priest, a doctor, or a so-called street person. You make your assessment of Carmen Bournes, who she is, where she is, what her connection is. She had a relationship with this guy, she had a child with him.

"But the most wonderful thing about her testimony is before [the defendant] is identified as a suspect in 2009, June, 2009, she told other police officers about what he told her back in 2004. That is the magical truth to his confession to her. Sure, she acknowledged when she sat down with officers in 2006 when he was arrested for what led to be the conviction for threatening, he did X, Y, and Z, and he told me about a woman he killed. Detective Stoldt knows nothing of this. She doesn't even know who [the defendant] is in 2006. . . . Bournes isn't currying favor. She has already told someone who would listen that this guy admitted to killing a woman in a basement area. *Wow*.

"I do mean it and I mean it again, consider everything said by all of us. You're drawn back to the conclusion of what the evidence presents you and who did it. Thank you, ladies and gentlemen." (Emphasis added.)

I

We first address the defendant's claim that that the prosecutor made improper comments throughout the state's initial closing argument. Specifically, he asserts that the prosecutor improperly (1) appealed to the emotions of the jurors, (2) provided his personal opinion of the evidence, and (3) made an improper "golden rule" argument. We disagree and address each alleged impropriety in turn.

A

First, the defendant asserts that the prosecutor improperly appealed to the emotions of the jurors during the state's initial closing argument by improperly stating that the jurors should "get over the horror and the shock and everything that comes with what contrib-

uted to [the victim's] death," describing the victim's body as being "naked from the waist down" on two occasions, commenting that an observer would say, "Oh my God," when viewing the crime scene, commenting that the defendant was "lying in wait" to "ambush" the victim in the "darkness," and describing the furnace room as a "bloodbath . . . ." We disagree.

"[I]t is well established that, [a] prosecutor may not appeal to the emotions, passions and prejudices of the jurors. . . . [S]uch appeals should be avoided because they have the effect of diverting the jury's attention from their duty to decide the case on the evidence. . . . When the prosecutor appeals to emotions, he invites the jury to decide the case, not according to a rational appraisal of the evidence, but on the basis of powerful and irrelevant factors which are likely to skew that appraisal." (Internal quotation marks omitted.) *State* v. *Tilus*, 157 Conn. App. 453, 482,      A.3d     , cert. granted, 317 Conn. 915,     A.3d     (2015). "It must be acknowledged that the line between comments that risk invoking the passions and prejudices of the jurors and those that are permissible rhetorical flourishes is not always easy to draw. The more closely the comments are connected to relevant facts disclosed by the evidence, however, the more likely they will be deemed permissible." *State* v. *Albino*, 312 Conn. 763, 773, 97 A.3d 478 (2014). A prosecutor is permitted to use vivid language to describe the "nature and enormity of the crime when supported by the evidence," and to the extent that such language appeals to the emotions of the jurors, it is "because of the nature of the crime and not because of the terminology the prosecutor used to get his [or her] point across." *State* v. *Andrews*, 313 Conn. 266, 301, 96 A.3d 1199 (2014). Thus, comments that are factually based on the evidence and not unduly provocative constitute permissible argument. See *State* v. *Albino*, supra, 774.

With the foregoing legal principles in mind, we conclude that the prosecutor did not improperly appeal to the emotions of the jurors. His comments regarding the victim being "naked from the waist down," the defendant "lying in wait" to "ambush" the victim in the "darkness," and the "horror" and "shock" of the crime scene, including his description of it as a "bloodbath" and the "Oh my God" remark, were all based on the evidence before the jury and were not unduly provocative.[9] See *State* v. *Andrews*, supra, 313 Conn. 301 (comment that case was about "brutal, vicious drug-filled homicide, about a young woman who lost her life at the squeezing hands of the defendant" deemed proper [emphasis omitted; internal quotation marks omitted]); *State* v. *Albino*, supra, 312 Conn. 774 (comments that victim's body was " 'peppered with bullets' " and that " 'the first bullet tore into his body' " deemed proper); *State* v. *Maner*, 147 Conn. App. 761, 791, 83 A.3d 1182 (comment describing victim as " 'poor young man in Waterbury lying dead

in his hallway' " deemed proper), cert. denied, 311 Conn. 935, 88 A.3d 550 (2014); cf. *State* v. *Albino*, supra, 775 (comment describing victim's body as showing " 'indignity of death' " deemed improper); *State* v. *Payne*, 260 Conn. 446, 463, 797 A.2d 1088 (2002) (comment describing victim's body as being " 'on a slab, on a cutting board' " deemed improper).

In addition, the defendant claims that the prosecutor's depiction of the defendant "lying in wait" to "ambush" the victim in the "darkness" was also improper because the prosecutor was not required to prove at trial that the defendant had lain in wait to ambush the victim. As a result, the defendant asserts that those comments were solely intended to be appeals to the jurors' emotions. We disagree. A prosecutor is entitled to use descriptive language to set forth the nature and background of a crime, so long as his or her comments are based on the evidence. See *State* v. *Andrews*, supra, 313 Conn. 301. The fact that the prosecutor did not have the burden to prove that the defendant ambushed the victim or lay in wait for her does not render his comments improper, as his comments described the manner in which the prosecutor believed that the defendant committed the crime on the basis of reasonable inferences drawn from the evidence.

For the foregoing reasons, we conclude that the comments challenged by the defendant as improper appeals to the emotions of the jurors were proper.

### B

Next, the defendant asserts that the prosecutor improperly provided the jury with his personal opinion of the case by commenting that "[y]ou literally look at the [crime] scene and say, Oh my God . . . ." We disagree. As an initial matter, immediately prior to the comment at issue, the prosecutor referred to the evidence. Then, immediately after the comment, he asked the jurors to set aside their emotions. Having reviewed the evidence, including the photographs of the crime scene in particular, we conclude that the comment, which was not phrased in the first person, reflected the reaction that the prosecutor believed the jurors reasonably may have experienced when they viewed the horrific evidence depicting the crime scene. Although a prosecutor may not provide the jury with his or her opinion as to the credibility of a witness or the guilt of the defendant, he or she is entitled to provide the jury with his or her comment upon the evidence presented and any reasonable inferences that can be drawn therefrom. See *State* v. *Washington*, 155 Conn. App. 582, 605–606, 110 A.3d 493 (2015). Like the comment regarding the "horror" and "shock" of the crime scene that we discussed previously in part I A of this opinion, we view the phrase, "Oh my God," to be another fair way of commenting on the reasonable inference, which

could be drawn from the evidence, that the crime scene was shocking. Therefore, the defendant's claim fails.

## C

Last, the defendant asserts that the prosecutor violated the prohibition against making "golden rule" arguments by asking the jurors to put themselves in the difficult position of one of the police officers investigating the crime scene and discovering the victim's body in the furnace room. By urging the jurors to view the crime scene from that perspective, the defendant contends, the prosecutor urged the jury to decide the case on the basis of sympathy. We disagree.

"[A] golden rule argument is one that urges jurors to put themselves in a particular party's place . . . or into a particular party's shoes. . . . Such arguments are improper because they encourage the jury to depart from neutrality and to decide the case on the basis of personal interest and bias rather than on the evidence. . . . They have also been equated to a request for sympathy. . . . The danger of these types of arguments lies in their [tendency] to pressure the jury to decide the issue of guilt or innocence on considerations apart from the evidence of the defendant's culpability. . . . [T]he animating principle behind the prohibition on golden rule arguments is that jurors should be encouraged to decide cases on the basis of the facts as they find them, and reasonable inferences drawn from those facts, rather than by any incitement to act out of passion or sympathy for or against any party. . . . Although we recognize that this danger is most acute when the prosecutor asks the jurors to put themselves in the position of the victim rather than the defendant or another witness . . . we conclude that the principle barring the use of such arguments is the same regardless of which individual is the subject of the prosecutor's emotional appeal." (Citation omitted; internal quotation marks omitted.) *State* v. *Daniel G.*, 147 Conn. App. 523, 557–58, 84 A.3d 9, cert. denied, 311 Conn. 931, 87 A.3d 579 (2014).

Here, the prosecutor did not divert the jurors' attention away from the evidence; instead, he directed them to view the evidence and used the perspective of one of the investigating police officers as a rhetorical tool to aid the jurors in visualizing the crime scene. The record suggests that the prosecutor's comments were not aimed to induce the jurors to experience feelings of sympathy or other emotions toward any of the investigating police officers, particularly since the behavior of the officers in no way related to any of the elements of the crimes charged or any interaction they had with the defendant. Cf. id., 559–60 ("the prosecutor's comment inviting the jurors to place themselves in the shoes of a police officer was tantamount to a request for sympathy and a recognition of the challenging tasks facing police officers" where police officer

had pursued defendant and pointed Taser at him). Rather, the prosecution was asking the jurors to consider the evidence at the crime scene dispassionately and carefully in the manner of one of the investigating officers. Therefore, the prosecutor's comments did not amount to an improper "golden rule" argument.

## II

We now turn to the defendant's claim that the prosecutor made improper comments throughout the state's rebuttal argument. Specifically, he claims that the prosecutor improperly denigrated his defense and the integrity of defense counsel by (1) suggesting that defense counsel was misleading the jurors, and (2) using excessive sarcasm when responding to defense counsel's arguments. We disagree and address each alleged impropriety in turn.

## A

First, the defendant asserts that the prosecutor improperly commented that the jurors would have to "get on that bus and ride the trip that [defense counsel] ask[ed them] to take" if they believed defense counsel's argument that the defendant had stumbled upon the victim's body after another individual had killed her. According to the defendant, the foregoing comment improperly suggested that defense counsel was misleading the jurors with a deceptive argument that had no basis in the record. We disagree.

"[T]he prosecutor is expected to refrain from impugning, directly or through implication, the integrity or institutional role of defense counsel. . . . There is a distinction [however] between argument that disparages the integrity or role of defense counsel and argument that disparages a theory of defense. . . . There is ample room, in the heat of argument, for the prosecutor to challenge vigorously the arguments made by defense counsel." (Internal quotation marks omitted.) *State* v. *James*, 141 Conn. App. 124, 149, 60 A.3d 1011, cert. denied, 308 Conn. 932, 64 A.3d 331 (2013).

With the foregoing principles in mind, we conclude that the prosecutor's "bus" comment was proper. We first note that "[c]losing arguments of counsel . . . are seldom carefully constructed in toto before the event; improvisation frequently results in syntax left imperfect and meaning less than crystal clear. While these general observations in no way justify prosecutorial [impropriety], they do suggest that a court should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations." (Internal quotation marks omitted.) *State* v. *Salazar*, 151 Conn. App. 463, 473, 93 A.3d 1192 (2014). Here, the prosecutor's "bus" comment did not unequivocally suggest that he was implying to the jurors that defense counsel was

misleading and deceiving them. It is reasonable to interpret the "bus" comment as an exasperated statement by the prosecutor indicating that defense counsel's argument was totally inconsistent with the evidence. Indeed, defense counsel argued that the defendant happened upon the body after someone else had killed the victim. Yet, the defendant's DNA was on the inside of the victim's pants and underwear. Absent a clear indication that the prosecutor's "bus" comment accused defense counsel of misleading and deceiving the jurors, we conclude that the comment constituted permissible rhetorical argument. Cf. *State* v. *Albino*, supra, 312 Conn. 776–77 (comments comparing "defense strategy to an octopus' defense mechanism of shooting ink into the water, thus muddying the water so the octopus can escape" and describing defense strategy as "shotgun approach . . . [y]ou shoot it against the wall and you hope that something will stick," deemed improper [internal quotation marks omitted]); *State* v. *Maguire*, 310 Conn. 535, 557, 78 A.3d 828 (2013) (comments referring to defense counsel's strategy as " 'smoke and mirrors' " and stating that defense counsel had taken jury on " 'magic trip' " deemed improper).

B

Next, the defendant asserts that the prosecutor improperly used excessive sarcasm by: proclaiming that he "only thought [he'd] say oh my God once," in response to defense counsel's argument that the defendant had found the victim's body after she had been killed; commenting that defense counsel's theory concerning the time line of the victim's death was "just amazing"; commenting that "[e]veryone [should] scratch their heads now," when referencing defense counsel's argument that, as the defendant left the basement after finding the victim's body, his blood had landed on the victim's pants and underwear found at the crime scene; and stating, "[w]ow," after addressing Bournes' testimony. We disagree.

"[O]ur Supreme Court has recognized that repetitive and excessive use of sarcasm is one method of improperly swaying the [jury]. . . . Additionally, we have recognized that the excessive use of sarcasm may improperly influence a jury. . . . A prosecutor's frequent and gratuitous use of sarcasm can [call on] the jurors' feelings of disdain, and likely sen[d] them the message that the use of sarcasm, rather than reasoned and moral judgment, as a method of argument [is] permissible and appropriate for them to use. . . . Although we neither encourage nor condone the use of sarcasm, we also recognize that not every use of rhetorical language or device is improper. . . . The occasional use of rhetorical devices is simply fair argument." (Citations omitted; internal quotation marks omitted.) *State* v. *Holley*, 144 Conn. App. 558, 569, 72 A.3d 1279, cert. denied, 310 Conn. 946, 80 A.3d 907

(2013). "[S]ome use of sarcastic and informal language, when intended to forcefully criticize a defense theory on the permissible bases of the evidence and the common sense of the jury, is not necessarily improper." *State* v. *James*, supra, 141 Conn. App. 150.

With the foregoing principles in mind, we conclude that the foregoing comments constituted permissible rhetorical flourish. None of the comments attacked defense counsel personally, but rather expressed the prosecutor's incredulity in regard to defense counsel's theory of defense. Furthermore, the comments were not excessively or derisively sarcastic. See *State* v. *Kendall*, 123 Conn. App. 625, 645, 2 A.3d 990 (comments referring to defense counsel's arguments as "ludicrous" and "incredulous" deemed proper [emphasis omitted; internal quotation marks omitted]), cert. denied, 299 Conn. 902, 10 A.3d 521 (2010); *State* v. *Boyd*, 89 Conn. App. 1, 42, 872 A.2d 477 (comments referring to defense counsel's arguments as " 'stupid' " and " 'baloney' " deemed proper), cert. denied, 275 Conn. 921, 883 A.2d 1247 (2005), overruled in part on other grounds by *State* v. *Kemah*, 289 Conn. 411, 432, 957 A.2d 852 (2008); cf. *State* v. *Rizzo*, 266 Conn. 171, 261–64, 833 A.2d 363 (2003) (prosecutor's repeated and excessive use of sarcasm deemed improper). For the foregoing reasons, we conclude that the comments challenged by the defendant as excessively sarcastic were proper.[10]

The judgment is affirmed.

In this opinion the other judges concurred.

[1] When asked whether he took care not to step on any potential piece of evidence while in the hallway, Aborn testified: "Yes. I made sure that I, you know, didn't purposely step in the blood. I mean, there was so much blood that, I mean, it would've ruined my shoes at the time."

[2] The pants and underwear were found in a shopping carriage in a side hallway in the basement.

[3] See *Miranda* v. *Arizona*, 384 U.S. 436, 478–79, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

[4] In 2012, the legislature amended § 53a-54b and changed the title of the statute from "Capital felony" to "Murder with special circumstances." The amended statute was applicable to crimes committed on or after April 25, 2012.

General Statutes (Rev. to 2003) § 53a-54b provides in relevant part: "A person is guilty of a capital felony who is convicted of any of the following . . . (6) murder committed in the course of the commission of sexual assault in the first degree . . . ."

[5] General Statutes (Rev. to 2003) § 53a-54b provides in relevant part: "A person is guilty of a capital felony who is convicted of any of the following . . . (5) murder by a kidnapper of a kidnapped person during the course of the kidnapping or before such person is able to return or be returned to safety . . . ."

[6] The victim's husband testified that the victim owned a purse and possessed a valid passport, neither of which were ever recovered.

[7] In *Polanco*, our Supreme Court held that "when a defendant is convicted of greater and lesser included offenses, the trial court shall vacate the conviction for the lesser offense rather than merging it with the conviction for the greater offense." *State* v. *Polanco*, supra, 308 Conn. 260. The court further held that a defendant's conviction for a vacated lesser included offense may be reinstated subsequently if the defendant's conviction for the greater offense is reversed "for reasons not related to the viability of the vacated conviction." Id., 263.

[8] Defense counsel did not present any evidence during trial that provided a reason for the defendant's presence at the crime scene, although he

appeared to suggest in his closing argument that the defendant broke into the basement with the intent to steal something of value.

[9] A review of the evidence, particularly the photographs of the crime scene, illustrates that the prosecutor's comments were not hyperbolic.

[10] In addition, we note that it is unclear whether the prosecutor's "[w]ow" comment was directed at defense counsel's theory of defense, as the comment may have been made in reaction to the strength of the state's case on the basis of Bournes' testimony.

---