******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.
******************************************************

# STATE OF CONNECTICUT *v.* DOVANTE GRAY-BROWN
## (AC 41385)

Alvord, Prescott and Flynn, Js.

*Syllabus*

Convicted of the crimes of felony murder, robbery in the first degree and carrying a pistol without a permit in connection with the shooting death of the victim, the defendant appealed, claiming, inter alia, that the trial court improperly denied his motion to suppress certain evidence that the police had seized from the bedroom of his home. The defendant and a friend, G, had arranged a drug deal with the victim in order to rob the victim of drugs and money. During the robbery, the defendant shot and killed the victim. Subsequently, the police went to the apartment where the defendant lived with his mother, C, and her husband at about six o'clock in the morning to execute an arrest warrant for the defendant. C told the police that the defendant was not home and gave the officers verbal consent to search the home for him, including his bedroom. A detective, L, thereafter obtained a consent form from his vehicle and observed C as she read and signed the consent form before the police began to search the bedroom. The police seized from the bedroom an empty ammunition tray, rubber gloves and an electronic scale. *Held*:

1. The trial court properly denied the defendant's motion to suppress the evidence that the police seized during their search of his bedroom, as that court's findings that C had actual authority to consent to the search of the defendant's bedroom and that her consent was voluntary were not clearly erroneous: C and her husband presumptively had actual authority to consent to the search, as they were the leaseholders of the apartment and the parents of the defendant, all of the twelve police officers who came to the home, except L and two other detectives, left before C consented to the search of the bedroom, C was unaware of whether weapons were being carried by the officers, who obtained verbal and written consent from C, and L reviewed the consent form with her; moreover, the officers did not forcefully enter the home, there was no evidence that they roused C out of bed, pointed their handguns at anyone or used loud or threatening language, there was no evidence that C initially refused to consent to the search or that the officers implied that they would obtain a warrant upon her refusal to consent, and C did not suggest that her decision to let the officers into her apartment was anything but the product of her own free will; furthermore, the court's conclusion that the defendant did not establish sufficiently exclusive control of his bedroom so as to render C's consent ineffective was supported by the evidence, as his bedroom door, which was not always locked, was not locked at the time of the search, C testified that she regularly entered the bedroom to clean the floor and that the defendant had never told her that she was not allowed in the room, and although C testified that the defendant helped pay bills and rent, which could tend to show that he had exclusive control over the room, C did not provide concrete details about those financial contributions.

2. The defendant's claim that the trial court abused its discretion by admitting into evidence the ammunition tray, latex gloves and electronic scale was unavailing, as that court reasonably concluded that the evidence the police seized from the defendant's bedroom was relevant and that its probative value outweighed any undue prejudice; the ammunition tray was probative to show that the defendant stored and used nine millimeter bullets, such as those that were used in the victim's murder, the latex gloves were relevant to explain why none of the DNA evidence or fingerprints collected at the shooting scene were attributable to the defendant, and the electronic scale was corroborative of G's testimony that the defendant participated in the scheme to rob the victim of drugs and money, and tended to demonstrate that the defendant was involved in the sale of drugs, which made his involvement in a scheme to steal drugs more likely, and the items were not unduly prejudicial and were

not likely to arouse the emotions of the jury.

3. The evidence was insufficient to prove that the firearm used in the underlying crime had a barrel of less than twelve inches in length, which was required to sustain the defendant's conviction of carrying a pistol without a permit in violation of statute (§ 29-35 [a]): the testimony of F, a police officer who used the generic term handgun to describe a spent shell casing, was not evidence from which the jury could have reasonably concluded that the firearm used in the victim's shooting had a barrel that was less than twelve inches in length, F did not testify that the spent shell casings found at the crime scene came from a handgun, the state presented no evidence that shell casings are ejected only from handguns and that the shell casings could not have come from a firearm with a barrel length of twelve inches or more, and the state's ballistics expert did not testify that bullets found at the crime scene had been fired from a handgun; moreover, any inference that a sawed-off gun barrel that was seized from the basement of the defendant's home was connected to the firearm used in the victim's shooting would amount to speculation, as there was no evidence as to what type of firearm the sawed-off barrel came from, when the gun barrel was sawed off, if the remaining portion of the barrel would be less than twelve inches in length or whether the firearm would still be capable of firing without the sawed-off portion, and L's testimony that the sawed-off barrel could fit into a .22 caliber weapon did not tie the barrel to the evidence that was found at the crime scene or to any specific type of firearm; furthermore, the type of ammunition that was used in the victim's shooting did not help to establish that the length of the barrel of the firearm was less than twelve inches, and G's testimony was too vague and imprecise to permit a jury reasonably to infer that the defendant had used a firearm with a barrel length of less than twelve inches to shoot the victim.

4. The trial court properly declined the defendant's request to give the jury a third-party culpability instruction, which the defendant claimed was necessary due to the presence of a partial fingerprint of a third person on the rental car that the victim had driven to the crime scene; the defendant did not establish a direct connection between the third party and the offense with which the defendant was charged, as the fingerprint could have been left from innocuous activity rather than by someone involved in the victim's shooting, and there was no other evidence that tended to show that the third party was involved in the victim's shooting or had a motive to commit the crime, or that the third party's involvement necessarily exculpated the defendant.

5. The trial court did not abuse its discretion when it declined to question a juror, who had been dismissed after the jury returned its verdict, about the defendant's claim that the juror became aware that the defendant was incarcerated when the juror saw him being transported to court by a correctional officer during the first week of trial; it was within the court's discretion, especially in light of the limitations of the applicable rule of practice (§ 42-33) and the state's interest in preventing juror harassment, to decline to question the dismissed juror after the court conducted a hearing, evaluated the evidence from the hearing and determined that the defendant's allegations were not credible.

Argued October 10, 2018—officially released March 12, 2019

*Procedural History*

Substitute information charging the defendant with the crimes of felony murder, robbery in the first degree and carrying a pistol without a permit brought to the Superior Court in the judicial district of Fairfield, where the court, *Kahn, J.*, denied the defendant's motion to suppress certain evidence; thereafter, the matter was tried to the jury; verdict and judgment of guilty, from which the defendant appealed. *Reversed in part; judgment directed.*

*Pamela S. Nagy*, assistant public defender, for the appellant (defendant).

*Laurie N. Feldman*, deputy assistant state's attorney,

with whom, on the brief, were *John C. Smriga*, state's attorney, and *Colleen P. Zingaro*, senior assistant state's attorney, for the appellee (state).

*Opinion*

PRESCOTT, J. The defendant, Dovante Gray-Brown, appeals from the judgment of conviction, rendered after a jury trial, of felony murder in violation of General Statutes § 53a-54c, robbery in the first degree in violation of General Statutes § 53a-134 (a) (1) and carrying a pistol without a permit in violation of General Statutes § 29-35 (a). The defendant claims on appeal that (1) the trial court improperly denied his motion to suppress several items of evidence taken from his bedroom because his mother lacked authority to consent to a search of his bedroom, (2) the court abused its discretion by admitting those same items into evidence because they were not relevant and were more prejudicial than probative, (3) there was insufficient evidence to prove, as required for the crime of carrying a pistol without a permit, that the defendant possessed a firearm that had a gun barrel less than twelve inches in length, (4) the court improperly denied the defendant's request for a third-party culpability instruction, and (5) the court improperly refused to question a juror regarding an issue of juror partiality that was raised after conviction. We agree with the defendant that there was insufficient evidence to prove, as required by § 29-35 (a), that the length of the barrel of the firearm used to commit the crime was less than twelve inches. Accordingly, we reverse the judgment of conviction as to that count with direction to render a judgment of acquittal on the charge of carrying a pistol without a permit. We are not persuaded, however, by the remainder of the defendant's claims and, accordingly, affirm the judgment of conviction in all other respects.

The facts, as could have been reasonably found by the jury, and procedural history, are as follows. The defendant and his friend, Dominick Gonzalez, arranged a drug deal with the victim, Dewayne Gardner, Jr., in order to rob him of drugs and money. Gonzalez knew the victim because the victim regularly supplied him with drugs that he then resold. Gonzalez asked the victim to meet him at 178 Poplar Street in Bridgeport so that he could purchase drugs from him.

In the early morning of December 16, 2013, the victim, believing he was going to sell narcotics to Gonzalez, drove a rental car to 178 Poplar Street. Prior to the meeting, the victim had exchanged text messages with Gonzalez. Gonzalez texted the victim that he was on his way to make the purchase and later texted that he had arrived at 178 Poplar Street. Gonzalez, however, had sent these text messages from several miles across town. Gonzalez, who was unable to get a ride to the agreed upon location, did not want to inform the victim that the defendant would be engaging in the transaction because the victim trusted Gonzalez more than the defendant.

In addition to exchanging text messages with the victim, Gonzalez was also in contact with the defendant. Gonzalez exchanged more than one dozen calls with the defendant between 12:30 a.m. and 3 a.m. The defendant was at his home on 1022 Hancock Avenue in Bridgeport during these calls. Hancock Avenue runs parallel to Poplar Street, with direct access to 178 Poplar Street through a vacant lot. The victim was in his car when the defendant arrived, with a firearm, to carry out the robbery. During the robbery, the defendant fired multiple gunshots into the car from the front passenger side, striking the victim.

Gonzalez later called the defendant to see if he had succeeded in the robbery. The defendant admitted to Gonzalez that he had shot the victim. The defendant also told Gonzalez that, after shooting the victim and fleeing the scene, he returned to take the victim's phone in order to dispose of it.

The police were called to the scene to respond to a report of a car accident. After being shot, the victim apparently attempted to flee the scene, but his vehicle hit a parked car at 211 Poplar Street. The police found an unspent nine millimeter bullet and two spent shell casings in the street at 178 Poplar Street. In the victim's car, they found bulletholes, bullets, and shell casings showing that a gunman had shot into the car from the passenger side. The victim sat dead in the driver's seat, with multiple gunshot wounds.

Although the victim habitually carried a cell phone and money with him, no wallet, money, cell phone, or drugs, other than a small amount of marijuana, were found in the car. A pocket of the victim's pants was turned inside out.

After obtaining the victim's phone records, the police spoke with Gonzalez and seized his phone for evidence. The police arrested Gonzalez on a charge of felony murder on December 21, 2013. Gonzalez initially lied to the police to protect himself and the defendant, but eventually cooperated with police and testified at trial pursuant to a plea deal.

Gonzalez told police that they could find ammunition that he and the defendant had been trying to sell in the basement of the multifamily house in which the defendant lived on the third floor. After obtaining consent from the owner of the house, the police searched the basement and did, in fact, find ammunition, as well as the sawed off barrel of a gun. A few days later, after obtaining consent from the defendant's mother to search the defendant's bedroom, the police found, inter alia, an electronic scale, rubber gloves, and a Remington ammunition tray for nine millimeter bullets in his room.

Forensic testing of the bullets and casings found at the crime scene indicated that they were fired from the same firearm. The bullets and casings were manufac-

tured, however, by three different companies and differed in metal, shape and stampings.

The defendant eventually was charged with felony murder, robbery in the first degree and carrying a pistol without a permit. On November 30, 2016, the jury found the defendant guilty of all charges. On the conviction of felony murder, the court, *Kahn, J.*, sentenced the defendant to forty-five years of incarceration and five years of special parole. Additionally, the court sentenced the defendant to a concurrent ten year term of incarceration on the count of robbery and a concurrent five year term of incarceration for carrying a pistol without a permit. This appeal followed. Additional facts will be set forth as necessary.

I

The defendant first claims that the trial court improperly denied his motion to suppress evidence collected from his bedroom because the police illegally had searched his room without a search warrant. Specifically, the defendant contends that the trial court improperly concluded that his mother had the authority to consent to the search of his bedroom and that she did so voluntarily. According to the defendant, the warrantless entry by police into his bedroom violated his constitutional rights, and, therefore, the evidence seized from this search should have been suppressed. We disagree.

In its oral decision on the defendant's motion to suppress, the court found the following additional facts. At approximately 6 a.m. on January 11, 2014, police officers arrived at the defendant's residence to execute an arrest warrant for the defendant charging him with felony murder. Approximately eight detectives and four uniformed officers arrived at the residence.

The defendant's mother, Claudette Brown, opened the door. The officers advised her that they had a warrant to arrest the defendant on the charge of felony murder. Brown told them that he was not home and gave the officers verbal consent to search the home for him. After searching the apartment and not locating the defendant, many of the law enforcement officers departed in an attempt to find the defendant at his girlfriend's house, where Brown said he might be. The only officers who remained at the defendant's residence were Lieutenant Christopher Lamaine and two police detectives.

Brown identified the defendant's bedroom to the officers. Lamaine noticed that the door was open and that the inside of the room was visible.[1] Brown was cooperative and gave permission to the officers to search the bedroom. Brown was calm and did not have difficulty communicating with the officers. Brown was aware that the police were investigating the homicide for which they had obtained an arrest warrant for her son.

Although the officers carried weapons at the time of the search, at no point did they unholster their weapons during their initial search for the defendant or during the subsequent search of his bedroom.

After Brown gave verbal consent to search the defendant's bedroom, Lamaine left the apartment to retrieve a consent form from his vehicle, which Brown subsequently signed.[2] After reviewing the form with Brown, and observing her reading and signing it, the officers began to search the defendant's bedroom. The detectives seized a number of items from the bedroom, including an ammunition tray, gloves, and an electronic scale.

We turn next to the well established law and standard of review that governs the defendant's claim. "A warrantless search is not unreasonable under either the fourth amendment to the constitution of the United States or article first, § 7, of the constitution of Connecticut if a person with authority to do so has freely consented to the search. . . . The state bears the burden of proving that the consent was free and voluntary and that the person who purported to consent had the authority to do so. . . . The state must affirmatively establish that the consent was voluntary; mere acquiescence to a claim of lawful authority is not enough to meet the state's burden. . . . The question whether consent to a search has in fact been freely and voluntarily given, or was the product of coercion, express or implied, [as well as whether the individual providing consent possessed the requisite authority] is a question of fact to be determined from the totality of all the circumstances. . . . As a question of fact, it is . . . to be decided by the trial court upon the evidence before that court together with the reasonable inferences to be drawn from that evidence." (Internal quotation marks omitted.) *State* v. *Azukas*, 278 Conn. 267, 275, 897 A.2d 554 (2006).

"On appeal, we apply a familiar standard of review to a trial court's findings and conclusions in connection with a motion to suppress. A finding of fact will not be disturbed unless it is clearly erroneous in view of the evidence and pleadings in the whole record . . . . The conclusions drawn by the trial court will be upheld unless they are legally and logically inconsistent with the evidence. . . . Because a trial court's determination of the validity of a . . . [seizure] implicates a defendant's constitutional rights, however, we engage in a careful examination of the record to ensure that the court's decision was supported by substantial evidence." (Internal quotation marks omitted.) *State* v. *Douros*, 90 Conn. App. 548, 553–54, 878 A.2d 399, cert. denied, 276 Conn. 914, 888 A.2d 85 (2005).

"In order for third-party consent to be valid, the consenting party must have possessed common authority over or other sufficient relationship to the premises or

effects sought to be inspected. . . . The authority that justifies the third party consent rests on mutual use of the property by persons who have joint access or control for most purposes, so that any of the inhabitants has the right to permit the inspection in his own right, and the others have assumed the risk that any of the cohabitants might permit the common area to be entered. . . .

"We also note that the overwhelming majority of the cases hold that a parent may consent to a police search of a home that is effective against a child, if a son or a daughter, whether or not still a minor, is residing in the home with the parents . . . . To overcome this authority, the child must establish sufficiently exclusive possession of the room to render the parent's consent ineffective. . . . Factors that [our Supreme Court] previously [has] considered when evaluating whether a child has established sufficiently exclusive possession of the room include: whether the child is paying rent; who has ownership of the home; whether the door to the bedroom is generally kept closed; whether there is a lock on the door; whether other members of the family use the room; and whether other members of the family had access to the room for any reason." (Citations omitted; internal quotation marks omitted.) *State* v. *Azukas*, supra, 278 Conn. 277–78.

In its oral decision on the motion to suppress, the trial court relied on *State* v. *Douros*, supra, 90 Conn. App. 548, to support its conclusion that the defendant's mother had the authority to permit the police to search the defendant's bedroom.[3] *Douros* is factually analogous to the present case. In *Douros*, after the adult defendant fled the scene of a domestic dispute, his mother gave the police permission to search his bedroom. Id., 551–52. This court held that there was evidence to support the trial court's finding that the defendant's mother exercised sufficient control over his bedroom to validly consent to a search of it by the police. Id., 555. In *Douros*, the defendant's mother owned the house in which the defendant and his mother resided. Id., 555–56. Additionally, she stated that she had access to the room and gave the police permission to search the room. Id., 552. This court concluded that the evidence supported the trial court's factual findings. Id., 556.

In the present case, the trial court's finding that Brown had actual authority to consent to the search of the defendant's bedroom is not clearly erroneous. She and her husband were the leaseholders of the apartment and the parents of the defendant and, thus, presumptively had actual authority to consent to a search. In order to refute this presumption, the defendant must establish sufficiently exclusive possession of the room to render the parent's consent ineffective.[4] To establish that he had exclusive control over the room, the defen-

dant argued that the door to his room had a lock. His bedroom door, however, was not always locked and was not locked at the time of the search. Brown testified that she regularly entered the defendant's bedroom to clean the floor and that the defendant had never told her that she was not allowed in the room. Although she would knock if he was home, if the defendant was not home and the door was unlocked, she would enter the room. Brown also testified that the defendant "chipped in" with bills and rent, which could tend to show that he had exclusive control over the room. Brown did not, however, provide concrete details about these financial contributions, such as whether the defendant paid a fixed amount of rent. In sum, the court's conclusion that Brown had actual authority to consent to the police search was supported by the evidence. Further, the court's conclusion that the defendant did not establish sufficiently exclusive control of his bedroom that would render Brown's consent ineffective was supported by the evidence.

We next review the court's finding that the consent to search was voluntarily given. The defendant argues that, under the totality of the circumstances, Brown's consent was not valid because she had been coerced to give her consent. Specifically, the defendant argues that Brown's consent was coerced because the search occurred in the early morning and twelve police officers were present at the house.

The trial court's finding that Brown's consent was voluntary was supported by the evidence and, therefore, not clearly erroneous. Although twelve officers initially arrived at the home, that number reflected the fact that they had come to arrest someone who they believed to be armed and responsible for a homicide. All of the officers except Lamaine and two police detectives left the house before the consent to the search occurred. Brown was unaware as to whether the officers carried weapons. The officers obtained both verbal and written consent from Brown, and Lamaine reviewed the consent form with her.

Although the officers arrived at about six o'clock in the morning, the officers did not forcefully enter the home. There is no evidence that the officers roused Brown out of bed in the middle of the night, broke down the door in the early hours of the morning, pointed their handguns at anyone or used loud or threatening language. See *State* v. *Reynolds*, 264 Conn. 1, 45, 836 A.2d 224 (2003), cert. denied, 541 U.S. 908, 124 S. Ct. 1614, 158 L. Ed. 2d 254 (2004). Additionally, there is no evidence that Brown initially refused to consent to the search or that the officers implied that they would obtain a warrant upon her refusal to consent to the search. Cf. *State* v. *Brunetti*, 279 Conn. 39, 57, 70, 901 A.2d 1 (2006), cert. denied, 549 U.S. 1212, 127 S. Ct. 1328, 167 L. Ed. 2d 900 (2007). Finally, Brown did not

herself suggest, during her testimony or otherwise, that her decision to let the officers into her apartment was anything but the product of her own free will. See *State v. Reynolds*, supra, 45–46. Therefore, the court properly denied the defendant's motion to suppress the evidence seized by the police from the defendant's room.

II

The defendant next claims that the trial court abused its discretion by admitting into evidence the ammunition tray,[5] latex gloves, and electronic scale[6] found in the defendant's bedroom because the items were not relevant and, even if relevant, they were more prejudicial than probative. We disagree.

The following additional facts are relevant to this claim. During Lamaine's testimony, the defendant objected to the admission into evidence of the ammunition tray, latex gloves, and electronic scale, arguing that they were not relevant and were unduly prejudicial. Specifically, the defendant argued that the Remington brand ammunition tray, which was empty when police seized it, was not relevant because the bullets recovered at the crime scene were not made by Remington. Further, the defendant argued that the scale did not have relevance to the present case because, although it may have been relevant to a drug related crime, it did not relate to the murder of the victim. The defendant further argued that the plastic gloves were not relevant because they could be used for many legal purposes, and the defendant had been training for employment in the health care field.

The state argued that the items were relevant and more probative than prejudicial because the ammunition tray linked the defendant to the bullets found in the basement and at the crime scene, the scale tended to prove that the defendant was meeting the victim to steal drugs, which could later be resold, and the gloves tended to explain why the defendant's DNA and fingerprints were not found at the crime scene. The court agreed, ruling that the items were relevant and that their probative value outweighed their prejudicial effect.

"Relevant evidence is evidence that has a logical tendency to aid the trier in the determination of an issue. . . . Evidence is relevant if it tends to make the existence or nonexistence of any other fact more probable or less probable than it would be without such evidence. . . . To be relevant, the evidence need not exclude all other possibilities; it is sufficient if it tends to support the conclusion [for which it is offered], even to a slight degree. . . . Evidence is not rendered inadmissible because it is not conclusive. All that is required is that the evidence tend[s] to support a relevant fact even to a slight degree, so long as it is not prejudicial or merely cumulative. . . .

"Although relevant, evidence may be excluded by the trial court if the court determines that the prejudicial effect of the evidence outweighs its probative value. . . . Of course, [a]ll adverse evidence is damaging to one's case, but it is inadmissible only if it creates undue prejudice so that it threatens an injustice were it to be admitted. . . . The test for determining whether evidence is unduly prejudicial is not whether it is damaging to the defendant but whether it will improperly arouse the emotions of the jury. . . . Reversal is required only [if] an abuse of discretion is manifest or [if an] injustice appears to have been done." (Citations omitted; internal quotation marks omitted.) *State* v. *Wilson*, 308 Conn. 412, 429–30, 64 A.3d 91 (2013).

In the present case, we agree with the court that the empty ammunition tray was probative to show that the defendant stored and used nine millimeter bullets such as those that were used in the underlying murder. Lamaine testified that it appeared that nine millimeter bullets would fit in the empty Remington ammunition tray. Thus, the empty ammunition tray found in the defendant's bedroom provided a potential link to the nine millimeter bullets and shell casings that were found at the scene of the shooting, as well as the ammunition seized from the basement of the defendant's home. Moreover, the fact that the ammunition tray was manufactured by Remington, but none of the bullets or shell casings found at the scene were made by Remington, does not vitiate the probative value of the ammunition tray because the assortment of bullets in the basement and at the crime scene tended to demonstrate that the defendant did not use bullets from a single manufacturer. In sum, the empty ammunition tray tended to demonstrate that these items were all connected to the defendant.

We also agree that the latex gloves were relevant to explain why none of the DNA evidence or fingerprints collected at the scene was attributable to the defendant. Gonzalez testified that the defendant wore gloves when he committed robberies. A forensic scientist, called as a witness by the state, testified that gloves could prevent the transfer of fingerprints. Additionally, a forensic scientist, called by the defense, admitted that gloves could prevent the transfer of DNA. Therefore, the defendant's possession of latex gloves provided an explanation for the absence of his DNA and fingerprints at the crime scene and was, therefore, highly probative.

Finally, the presence of an electronic scale in the defendant's bedroom tended to demonstrate that the defendant was involved in the sale of drugs and was corroborative of Gonzalez' testimony that the defendant participated in the scheme to rob the victim of drugs and money. Although the defendant argues that a scale was not needed for this particular robbery, it was nonetheless relevant to show that he sold drugs, making his

involvement in a scheme to steal drugs more likely.

Although damaging to the defendant, these items were not unduly prejudicial. The admission of the electronic scale, which tends to show that the defendant was involved in the sale of drugs, was unlikely to shock the jury because Gonzalez later testified, without objection, that the defendant used and sold drugs. Gonzalez also testified, without objection, that the defendant carried firearms and wore gloves during robberies to prevent leaving evidence that would connect him to the crime. Thus, these items were not likely to arouse the emotions of the jury any more than the testimony provided by Gonzalez. Moreover, there is nothing inherent in the nature of the items that would likely overcome the reason of, or, " 'improperly arouse the emotions' " of the jury. *State* v. *Wilson*, supra, 308 Conn. 430. Therefore, the court reasonably concluded that the evidence was relevant and that its probative value outweighed any undue prejudice to the defendant.

### III

The defendant next claims that there was insufficient evidence to sustain his conviction of carrying a pistol without a permit under § 29-35 (a). Specifically, the defendant argues that the state failed to introduce sufficient evidence from which the jury reasonably could have concluded beyond a reasonable doubt that the length of the barrel of the firearm used to commit the crime was less than twelve inches. In support of his insufficiency claim, the defendant points to the fact that there were no known eyewitnesses to the shooting and that the firearm used to shoot the victim was never found. Additionally, the defendant argues that the jury was not presented with other circumstantial evidence from which it reasonably could have inferred that the length of the barrel of the firearm used to commit the crime was less than twelve inches.

In response, the state contends that the following circumstantial evidence presented to the jury permitted it reasonably to infer beyond a reasonable doubt that the defendant had used a firearm with a barrel less than twelve inches in length to shoot the victim: (1) testimony that the spent casings at the scene were fired from a handgun; (2) the sawed-off barrel the police discovered in the defendant's basement; (3) the ballistics evidence recovered at the crime scene and ammunition found in the defendant's basement; (4) the fact that the crime scene bullets and casings came from the same gun; and (5) testimony that Gonzalez and the defendant carried guns whenever they sold drugs, the defendant was a "stickup guy," and, in a prior robbery, the defendant used a .22 caliber revolver. We agree with the defendant that the evidence was insufficient to prove beyond a reasonable doubt that he violated § 29-35 (a).

"The standard of review we apply to a claim of insuffi-

cient evidence is well established. In reviewing the sufficiency of the evidence to support a criminal conviction we apply a two-part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [finder of fact] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . .

"We note that the jury must find every element proven beyond a reasonable doubt in order to find the defendant guilty of the charged offense, [but] each of the basic and inferred facts underlying those conclusions need not be proved beyond a reasonable doubt. . . . If it is reasonable and logical for the jury to conclude that a basic fact or an inferred fact is true, the jury is permitted to consider the fact proven and may consider it in combination with other proven facts in determining whether the cumulative effect of all the evidence proves the defendant guilty of all the elements of the crime charged beyond a reasonable doubt." (Citation omitted; internal quotation marks omitted.) *State* v. *Perkins*, 271 Conn. 218, 246, 856 A.2d 917 (2004).

"Because [t]he only kind of an inference recognized by the law is a reasonable one [however] . . . any such inference cannot be based on possibilities, surmise or conjecture. . . . It is axiomatic, therefore, that [a]ny [inference] drawn must be rational and founded upon the evidence. . . . [T]he line between permissible inference and impermissible speculation is not always easy to discern. When we infer, we derive a conclusion from proven facts because such considerations as experience, or history, or science have demonstrated that there is a likely correlation between those facts and the conclusion. If that correlation is sufficiently compelling, the inference is reasonable. But if the correlation between the facts and the conclusion is slight, or if a different conclusion is more closely correlated with the facts than the chosen conclusion, the inference is less reasonable. At some point, the link between the facts and the conclusion becomes so tenuous that we call it speculation. When that point is reached is, frankly, a matter of judgment." (Internal quotation marks omitted.) *State* v. *Reynolds*, supra, 264 Conn. 93.

"Moreover, it does not diminish the probative force of the evidence that it consists, in whole or in part, of evidence that is circumstantial rather than direct. . . . It is not one fact, but the cumulative impact of a multitude of facts which establishes guilt in a case involving substantial circumstantial evidence. . . . In evaluating evidence, the [finder] of fact is not required to accept as dispositive those inferences that are consistent with the defendant's innocence. . . . The [finder of fact] may draw whatever inferences from the evidence or facts established by the evidence it deems to be reason-

able and logical. . . .

"[A]s we have often noted, proof beyond a reasonable doubt does not mean proof beyond all possible doubt . . . nor does proof beyond a reasonable doubt require acceptance of every hypothesis of innocence posed by the defendant that, had it been found credible by the [finder of fact], would have resulted in an acquittal. . . . On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the [finder of fact's] verdict of guilty." (Citation omitted; internal quotation marks omitted.) *State* v. *Perkins*, supra, 271 Conn. 246–47.

Finally, "[w]e . . . emphasize the weighty burden imposed on the state by the standard of proof beyond a reasonable doubt. Under bedrock principles of our criminal justice system, it is obviously not sufficient for the state to prove simply that it is more likely than not that the defendant was convicted of [the offense], or even that the evidence is clear and convincing that he was so convicted. . . . Our Supreme Court has described the beyond a reasonable doubt standard as a subjective state of near certitude . . . ." (Citation omitted; internal quotation marks omitted.) *State* v. *Tenay*, 156 Conn. App. 792, 810, 114 A.3d 931 (2015).

We now turn to the essential elements of the offense. Section 29-35 (a) provides in relevant part: "No person shall carry any pistol or revolver upon his or her person, except when such person is within the dwelling house or place of business of such person, without a permit to carry the same issued as provided in section 29-28 . . . ." "[T]o obtain a conviction for carrying a pistol without a permit, the state [is] required to prove beyond a reasonable doubt that the defendant (1) carried a pistol, (2) for which he lacked a permit, (3) while outside his dwelling house or place of business. . . .

"The term pistol and the term revolver . . . as used in [General Statutes §§] 29-28 to 29-38, inclusive, mean any firearm having a barrel less than twelve inches in length. General Statutes § 29-27. In cases in which a violation of § 29-35 is charged, the length of the barrel is . . . an element of [the] crime and must be proven beyond a reasonable doubt. . . . We observe, however, that, like the other essential elements of the offense, the length of the barrel of a pistol or revolver may be proven by circumstantial, rather than direct, evidence. Direct numerical evidence is not required to establish the length of the barrel of a handgun in question." (Citations omitted; internal quotation marks omitted.) *State* v. *Covington*, 184 Conn. App. 332, 340, 194 A.3d 1224, cert. granted on other grounds, 330 Conn. 933, 195 A.3d 383 (2018).

Next, we examine the circumstantial evidence pre-

sented at trial from which the state contends a jury reasonably could conclude that the firearm carried by the defendant had a barrel length of less than twelve inches. First, the state cites Officer Thomas Flaherty's testimony that the shell casings "were fired from a handgun." The state argues that "Officer Flaherty's testimony alone, that the bullet casings were shot from a 'handgun,' satisfies the element."[7]

The state, however, takes this testimony out of context. The following exchange occurred between the prosecutor and Officer Flaherty:

"Q. And with regard to the spent casings, can you describe to the jury what that means?

"A. Rounds that were fired from a handgun. There's— a projectile discharged from the firearm. It's just the shell casing itself that, after a—after being fired, it's going to be in the area of—where the shots were fired."

When Officer Flaherty used the word "handgun," he was speaking in general terms. Indeed, in the very next sentence, he refers more generally to a "firearm." In context, Officer Flaherty was not testifying that the spent shell casings found at the scene came specifically from a handgun. The state did not present any evidence that shell casings are ejected only from handguns and that the shell casings could not have come from a firearm with a barrel length of twelve inches or more. Moreover, the state's ballistics expert did not testify that the bullets found at the crime scene had been fired from a handgun. The use of the generic term "handgun" during Officer Flaherty's testimony to describe a spent shell casing for the jury was not evidence from which the jury could have reasonably concluded that the firearm used in the crime in this case had a barrel that was less than twelve inches in length.

Next, the state argues that the jury could infer that the defendant carried a short-barreled firearm because the police seized a sawed-off gun barrel from his basement. In its brief, the state argues that "[t]he sawed-off barrel in his basement showed that [the defendant] had customized a long-barreled gun into a short-barreled gun." There is no evidence, however, that connects the gun barrel found in the basement to any firearm carried by the defendant or used to shoot the victim. The state's ballistics expert did not testify about the gun barrel. There is no evidence as to what type of firearm the barrel came from, when the gun barrel was sawed off, if the remaining portion of the barrel would be less than twelve inches in length, or whether the firearm would still be capable of firing without the sawed-off portion. The only testimony regarding what type of firearm the barrel came from was during the following colloquy between the prosecutor and Lamaine:

"Q. Detective, do you have any knowledge as to what

type of weapon that barrel could fit into?

"A. I believe it was a .22 caliber.

"Q. Do you want to look at it?

"A. May I look at it?

"Q. Yeah.

"A. Refresh my recollection. It's been a while. I don't see any markings. I mean, if you want to draw my attention to some but—

"Q. No. I just thought you might know.

"A. No.

"Q. But that particular item is meant to fit into a gun; correct?

"A. It is a gun barrel that's been sawed off, yes."

Lamaine's testimony simply establishes only that it was, in fact, a sawed-off gun barrel. This testimony does not tie the barrel to the evidence found at the crime scene or to any specific type of firearm whatsoever. Further, there was no testimony that a .22 caliber firearm was capable of shooting nine millimeter bullets, such as those recovered from the scene. Thus, any inference that the gun barrel was connected to the firearm used in the shooting would amount to sheer speculation.

The state also asserts that the jury was entitled to infer that the length of the barrel of the firearm used to commit the shooting was less than twelve inches from the ballistics evidence found at the crime scene and in the defendant's basement. We are not persuaded. The state's expert in the field of firearm and tool mark examinations provided no testimony about the types of firearms that use nine millimeter ammunition or the barrel lengths of such firearms. Therefore, the type of ammunition, without more, does not help to establish that the length of the barrel of the firearm used to commit the offense was less than twelve inches.

Finally, the state relies on certain portions of Gonzalez' testimony as circumstantial evidence that the barrel of the firearm was less than twelve inches. Specifically, the state relies on Gonzalez' acknowledgment that the defendant was a stickup guy in response to a question by defense counsel, and his testimony that the defendant had used a .22 caliber revolver in a prior robbery and that he and the defendant kept guns on them "[j]ust in case." Specifically, the state argues that the jury could infer from this testimony that the defendant carried a handgun that he could easily conceal and, thus, that the gun used in the shooting must have had a barrel less than twelve inches in length.

Regarding Gonzalez' acknowledgment that the defendant was a stickup guy, the state cites to *Augustine* v. *State*, 201 Miss. 277, 291, 28 So. 2d 243 (1946), to contend

that "the common understanding of 'stick-up' is a hold-up, usually by use of a pistol."[8] Therefore, the state asserts, Gonzalez' acknowledgment that the defendant was a stickup guy supports a finding that the gun used by the defendant was a pistol or a gun with a barrel length less than twelve inches. We are not persuaded by this argument. The word "stickup" is commonly understood as meaning a robbery with the use of *any* weapon. See, e.g., Black's Law Dictionary (10th Ed. 2014) p. 1640 (defining "stickup" as "[a]n armed robbery in which the victim is threatened by the use of weapons"). Therefore, testimony that the defendant was a stickup guy was not circumstantial evidence from which the jury reasonably could infer that the length of the gun barrel of the firearm used to commit the offense was less than twelve inches.

We are also unpersuaded that Gonzalez' testimony that the defendant used a revolver in a prior robbery and kept a gun on him "[j]ust in case" was evidence from which the jury reasonably could infer that the defendant had used a revolver or other short-barreled firearm in the present case. Testimony that the defendant merely carried a "gun" on him, with no specificity regarding the size of the firearm, is not probative of whether the firearm used in the present case was a handgun with a barrel length of less than twelve inches. Moreover, Gonzalez' testimony that the defendant possessed a .22 caliber revolver is actually inconsistent with the ballistics evidence collected at the crime scene. That evidence suggests that a nine millimeter firearm was used. Consequently, the defendant's prior possession of a .22 caliber revolver lacks probative value regarding the type of firearm used in the present case. The testimony of Gonzalez is simply too vague and imprecise to permit a jury reasonably to infer that the defendant used a firearm with a barrel length of less than twelve inches to shoot the victim in the present case.

In sum, the jury reasonably could not have concluded beyond a reasonable doubt that the firearm used by the defendant in the underlying crime had a barrel of less than twelve inches in length. We therefore conclude that there was insufficient evidence to prove the required elements under § 29-35 and the defendant's conviction on that charge must be reversed.

## IV

The defendant next claims that the court improperly declined his request to give a third-party culpability instruction to the jury. We disagree.

The following additional facts are relevant to this claim. The police found two fingerprints on the column along the passenger door of the victim's car. The location of the fingerprints suggested that "somebody [had been] reaching in [to the car]." One of the fingerprints

matched with someone named Allen Garrett through the Automated Fingerprint Identification System.[9] The defendant offered no other information about Garrett into evidence.

Prior to the close of evidence, the defendant submitted a written request for a third-party culpability instruction. The court held a charge conference in which it heard argument on the defendant's request for a third-party culpability instruction. The defendant argued that, on the basis of the presence of Garrett's fingerprint on the victim's vehicle, he was entitled to a third-party culpability instruction. The court denied the defendant's request for a third-party culpability instruction, concluding that "the factual predicate for [it did] not exist."[10]

"In determining whether the trial court improperly refused a request to charge, [w]e . . . review the evidence presented at trial in the light most favorable to supporting the . . . proposed charge. . . . A request to charge which is relevant to the issues of [a] case and which is an accurate statement of the law must be given. . . . If, however, the evidence would not reasonably support a finding of the particular issue, the trial court has a duty *not* to submit it to the jury. . . . Thus, a trial court should instruct the jury in accordance with a party's request to charge [only] if the proposed instructions are reasonably supported by the evidence. . . .

"It is well established that a defendant has a right to introduce evidence that indicates that someone other than the defendant committed the crime with which the defendant has been charged. . . . The defendant must, however, present evidence that directly connects a third party to the crime. . . . It is not enough to show that another had the motive to commit the crime . . . nor is it enough to raise a bare suspicion that some other person may have committed the crime of which the defendant is accused. . . .

"The admissibility of evidence of third party culpability is governed by the rules relating to relevancy. . . . Relevant evidence is evidence having any tendency to make the existence of any fact that is material to the determination of the proceeding more probable or less probable than it would be without the evidence. . . . Accordingly, in explaining the requirement that the proffered evidence establish a direct connection to a third party, rather than raise merely a bare suspicion regarding a third party, we have stated: Such evidence is relevant, exculpatory evidence, rather than merely tenuous evidence of third party culpability [introduced by a defendant] in an attempt to divert from himself the evidence of guilt. . . . In other words, evidence that establishes a direct connection between a third party and the charged offense is relevant to the central question before the jury, namely, whether a reasonable doubt exists as to whether the defendant committed the

offense. Evidence that would raise only a bare suspicion that a third party, rather than the defendant, committed the charged offense would not be relevant to the jury's determination. A trial court's decision, therefore, that third party culpability evidence proffered by the defendant is admissible, necessarily entails a determination that the proffered evidence is relevant to the jury's determination of whether a reasonable doubt exists as to the defendant's guilt. . . .

"[I]f the evidence pointing to a third party's culpability, taken together and considered in the light most favorable to the defendant, establishes a direct connection between the third party and the charged offense, rather than merely raising a bare suspicion that another could have committed the crime, a trial court has a duty to submit an appropriate charge to the jury." (Citations omitted; emphasis added; internal quotation marks omitted.) *State* v. *Arroyo*, 284 Conn. 597, 607–10, 935 A.2d 975 (2007).

In the present case, the trial court concluded that a third-party culpability instruction was not warranted by a partial fingerprint of a third person on the vehicle in the absence of other evidence connecting that person to the crime. The fingerprint could have been left from innocuous activity, rather than from someone involved in the commission of the crime. Although there was no direct evidence as to the ownership of the vehicle the victim used on the night of the shooting, the victim was known to use rental cars, and, in such instances, third parties would readily have had access to the same car. With nothing more, a partial fingerprint on the outside of the car door does not satisfy the requirement that there be a *direct* connection between a third party and the crime.

The present case is factually analogous to *State* v. *James*, 141 Conn. App. 124, 136–37, 60 A.3d 1011, cert. denied, 308 Conn. 932, 64 A.3d 331 (2013). In *James*, two pieces of evidence, a hat with a "mixed sample" of DNA and multiple fingerprints lifted from a car, were linked to the defendant, as well as unidentified persons. Id. 136–37. The hat was a "mixed sample," meaning that more than one person, including the defendant, had contributed to its DNA profile. Id. The car had fingerprints of the defendant and his accomplice, as well as five fingerprints that did not belong to them. Id., 136. Prior to closing arguments, the defendant requested a third-party culpability charge on the basis of this information, which the trial court denied. Id., 137. This court ultimately held that "when viewed in a light most favorable to the defendant, the proffered DNA and fingerprint evidence only *indirectly* and *tenuously* implicated third parties without directly absolving or exculpating the defendant, [and] the court did not abuse its discretion by refusing to give a third party culpability instruction." (Emphasis added.) Id., 138–39. As in *James*, the finger-

print evidence relating to Garrett only *indirectly* and *tenuously* implicated him in this case.

There simply was no other evidence that could tend to show that Garrett was somehow involved in the commission of the victim's murder, had a motive to commit the crime, or that his involvement necessarily exculpated the defendant from involvement as well. Thus, even when we consider this evidence in the light most favorable to the defendant, it did not establish a direct connection between the third party and the charged offense. Accordingly, we conclude that the trial court properly determined that the defendant was not entitled to a jury instruction on third-party culpability.

V

The defendant's final claim on appeal is that the court improperly declined to question a juror regarding an issue of juror partiality that was raised after the jury returned its verdict. Specifically, the defendant claims that the court's inquiry was inadequate under *State* v. *Brown*, 235 Conn. 502, 668 A.2d 1288 (1995), and that the court should have summoned the identified juror back to court and questioned him regarding the event that gave rise to a question about his partiality. We disagree.

The following additional facts are relevant to this claim. On January 27, 2017, after the defendant was found guilty, but prior to sentencing, he filed a motion for a hearing. The defendant claimed in that motion that a juror had seen him being transported to court by a correctional officer during the first week of trial and thus became aware that he was incarcerated. This knowledge, the defendant argues, violated his constitutional right to the presumption of innocence. The court granted the motion in part and a hearing was held on the issue.

At the hearing, the defendant testified to the following facts. A juror, who was driving a truck behind the defendant, saw the defendant while he was being transported to court in a prisoner transport vehicle. During transport, the defendant was wearing an orange jumpsuit, shackles and handcuffs, and was traveling in a light gray sedan with no markings and windows that were not tinted.[11] The defendant was sitting across the seat with his back to the driver's side door and his legs up. When he saw the defendant, the juror covered his face with a folder and slowed his vehicle in order to put distance between the two cars. The defendant first testified that this interaction took five to six minutes, but on cross-examination, stated it was likely just over a minute. He also testified that he immediately told his attorney about the incident. His attorney, however, did not remember the defendant informing him of the incident and had no notes recounting it.

After the hearing, the court denied the defendant's

request to question the juror who allegedly saw him being transported to court. The court found that the defendant was not credible, and that even if the facts alleged by the defendant were to be believed, there was no basis for further inquiry.

We turn to the law that governs the defendant's claim.[12] "Jury impartiality is a core requirement of the right to trial by jury guaranteed by the constitution of Connecticut, article first, § 8, and by the sixth amendment to the United States constitution. . . . In essence, the right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, indifferent jurors. . . . The modern jury is regarded as an institution in our justice system that determines the case solely on the basis of the evidence and arguments given [it] in the adversary arena after proper instructions on the law by the court. . . . Consideration [by the jury] of extrinsic evidence is presumptively prejudicial because it implicates the defendant's constitutional right to a fair trial before an impartial jury. . . .

"In the past, [our Supreme Court has] recognized that the trial court has broad discretion to determine the form and scope of the proper response to allegations of jury misconduct. . . . In exercising that discretion, the trial court must zealously protect the rights of the accused. . . . We have limited our role, on appeal, to a consideration of whether the trial court's review of alleged jury misconduct can fairly be characterized as an abuse of its discretion. . . . Even with this circumscribed role, we have reserved the right to find an abuse of discretion in the highly unusual case in which such an abuse has occurred. . . . The trial judge's discretion, which is a legal discretion, should be exercised in conformity with the spirit of the law and in a manner to subserve and not to impede or defeat the ends of substantial justice." (Citations omitted; internal quotation marks omitted.) Id., 522–24.

"Although both the state and a criminal defendant have an interest in impartial jury trials . . . after a jury verdict has been accepted, other state interests emerge that favor proceedings limited in form and scope. The state has a strong interest in the finality of judgments . . . and in protecting the privacy and integrity of jury deliberations, preventing juror harassment and maintaining public confidence in the jury system." (Citations omitted.) Id., 531.

Finally, Practice Book § 42-33 provides: "Upon inquiry into the validity of a verdict, no evidence shall be received to show the effect of any statement, conduct, event or condition upon the mind of a juror nor any evidence concerning mental processes by which the verdict was determined. Subject to these limitations, a juror's testimony or affidavit shall be received when it concerns any misconduct which by law permits a jury to be impeached." Therefore, a trial court must proceed

carefully in examining jurors regarding their verdict for fear of straying into an improper examination of the mental processes used by the jurors in reaching their verdict. Cf. *State* v. *Johnson*, 288 Conn. 236, 264–65, 951 A.2d 1257 (2008).

In the present case, the court held a hearing regarding the alleged misconduct and concluded that the defendant's allegations were not credible. The court simply did not believe that the defendant told his attorney about the alleged incident or that the incident happened at all. After listening to testimony from the defendant and reviewing cases cited by counsel, the trial court held that there was "no factual or legal basis to conduct any further inquiry into [the] matter, nor [was] there a factual or legal basis for either the relief requested, which [was] further inquiry of . . . the juror who allegedly saw the defendant in a vehicle . . . [and] a motion for a new trial." The court concluded that, even if the allegations were credited, the defendant was essentially in a civilian vehicle, that due to his position in the vehicle, his shackles and handcuffs would not have been visible, and that it was unclear whether his clothing would have been visible.

The defendant relies on *State* v. *Brown*, supra, 235 Conn. 502, to argue that the court was required to summon the juror for questioning. *Brown*, however, is not factually similar to the present case. In *Brown*, an anonymous letter was sent to a judge alleging jury misconduct in a case over which the judge had presided. Id., 519–20. Defense counsel learned of the letter on the day of sentencing. Id., 520. At that time, the defendant orally amended his motion for a new trial to include the alleged jury misconduct. Id., 520–21. The court heard brief argument on both the defendant's motion for a judgment of acquittal and motion for a new trial, and subsequently denied both motions. Id., 521. On appeal, the defendant argued that the trial court had violated his state and federal constitutional rights by failing to conduct an evidentiary hearing to investigate the allegations of jury misconduct in the letter. Id. Our Supreme Court held that, although an evidentiary hearing was not required, "in the circumstances of this case, the trial court improperly failed to conduct *any inquiry whatsoever* specifically addressing the allegations of jury misconduct contained in the letter." (Emphasis added.) Id.

*Brown* was "one of [the] highly unusual cases of an abuse of discretion." Id., 524. "Although written anonymously, the letter was accurately addressed to the judge who had presided over the defendant's trial and contained accurate information about the defendant and the charges involved in the case. The letter also contained specific and facially credible allegations of jury exposure to racially derogatory remarks regarding the defendant allegedly made by court officials, and named

as the source of these allegations a person who was accurately identified as a juror." Id., 524–25.

In the present case, and unlike *Brown*, the court held a hearing regarding the alleged juror misconduct and determined that the defendant's allegations were *not* credible. It was well within the discretion of the court, especially considering the limitations of Practice Book § 42-33 and the state's interest in preventing juror harassment, to decline to question a dismissed juror after evaluating the evidence from the hearing and determining that the allegations of misconduct simply were not credible. *Brown* does not require the court to conduct a full evidentiary hearing, and certainly does not require the court always to question a juror. Therefore, the court did not abuse its discretion by declining to question the juror regarding the alleged incident and by denying the defendant's request for a new trial.

The judgment is reversed only as to the conviction of carrying a pistol without a permit in violation of § 29-35 (a) and the case is remanded with direction to render judgment of not guilty on that charge; the judgment is affirmed in all other respects.

In this opinion the other judges concurred.

[1] The record is unclear as to whether Lamaine observed that the defendant's bedroom door was open when the officers first arrived to the apartment, or after the initial search for the defendant.

[2] The form stated: "I, Claudette Brown, having been informed of my constitutional right not to have a search conducted without a search warrant and my right to refuse to consent to such a search, I do hereby consent to have the following members conduct a complete search of my residence, place of business, garage and/or place located at 1022 Hancock [Avenue], third floor, Bridgeport, Connecticut." The notice further stated that "these officers are authorized to take from the aforesaid mentioned location such materials or other property as they may desire and examine and perform tests on any and all items seized." It also states that "this written permission is being given by me to the above named officers voluntarily and without duress, threats, intimidation, or promises of any kind." The notice was then signed by Brown and two of the detectives or officers as witnesses.

[3] If a person who does not have actual authority consents to a search, the search may still be valid under the doctrine of apparent authority. The United States Supreme Court has recognized an apparent authority doctrine, under which "a warrantless entry is valid when based upon the consent of a third party whom the police, at the time of the entry, reasonably believe to possess common authority over the premises, but who in fact does not do so." *Illinois* v. *Rodriguez*, 497 U.S. 177, 179, 110 S. Ct. 2793, 111 L. Ed. 2d 148 (1990). The defendant argues that the trial court decided the motion to suppress on the basis of the doctrine of apparent authority, rather than actual authority, because it relied on *Douros*, which the defendant argues is an apparent authority case. We are not persuaded by the defendant's argument that *Douros* was decided on the doctrine of apparent authority. See *State* v. *Azukas*, supra, 278 Conn. 280 n.6. The court in *Douros*, and the trial court in the present case, decided their respective cases on the basis of the consenting party's actual authority. Therefore, we do not undergo an analysis of the reasonableness of the officer's inquiry as required by the apparent authority doctrine. See generally *State* v. *Buie*, 312 Conn. 574, 94 A.3d 608 (2014).

[4] Our Supreme Court's decision in *State* v. *Azukas*, supra, 278 Conn. 278, imposes a burden shifting framework in circumstances in which "a son or daughter, whether or not still a minor, is residing in the home with the parents . . . ." In such circumstances, our Supreme Court has concluded that the child must overcome the presumptive authority of a parent to consent to search with sufficient evidence that the child has exclusive possession of the bedroom.

[5] An ammunition tray is a tray designed to store bullets. Each hole in the tray is designed to hold one round of ammunition. The tray is a part of the packaging that is often included with the purchase of rounds of ammunition.

[6] An electronic scale is customarily used by narcotics sellers to weigh narcotics in order to package and sell them. See *State* v. *McNeil*, 154 Conn. App. 727, 731, 106 A.3d 320, cert. denied, 316 Conn. 908, 111 A.3d 884 (2015).

[7] The state relies on *State* v. *Miles*, 97 Conn. App. 236, 242, 903 A.2d 675 (2006), for the proposition that testimony that a "handgun" was used in the commission of the offense is enough to establish beyond a reasonable doubt that the firearm had a barrel of less than twelve inches. See also *State* v. *Williams*, 231 Conn. 235, 252, 645 A.2d 999 (1994), overruled in part on other grounds by *State* v. *Murray*, 254 Conn. 472, 487, 757 A.2d 578 (2000); *State* v. *Covington*, supra, 184 Conn. App. 345; *State* v. *Fleming*, 111 Conn. App. 337, 347, 958 A.2d 1271 (2008), cert. denied, 290 Conn. 903, 962 A.2d 794 (2009); *State* v. *Williams*, 48 Conn. App. 361, 370–72, 709 A.2d 43, cert. denied, 245 Conn. 907, 718 A.2d 16 (1998). The state places far more weight on *Miles* than it will bear. In *Miles*, and the other cases cited previously, there was testimony by an eyewitness who actually saw the firearm that was used during the commission of the offense and described it to be a "handgun," a small pistol, or otherwise described how the firearm was handled or stored in a way such that it was likely to have a barrel length of less than twelve inches. Here, there was no eyewitness who observed the firearm used by the defendant and stated that it could be held in one hand or concealed in a small space.

[8] We note that the Mississippi Supreme Court cited no authority for this common understanding. Moreover, this case was decided almost seventy-five years ago and common parlance changes over time and geographic areas.

[9] The Automated Fingerprint Identification System is a database of all the images of the fingerprints taken either during an arrest booking procedure or fingerprints submitted for background checks through job application procedures. The database is kept in the state police bureau of identification.

[10] The court however, did not preclude the defendant from arguing during closing arguments that the presence of Garrett's fingerprint raised a reasonable doubt regarding the defendant's guilt.

[11] After the hearing had concluded, but before sentencing, the court contacted marshals at the Department of Correction and determined that the windows were, in fact, tinted. The court noted that this information did not affect the outcome of the hearing.

[12] Although we examine the defendant's claim under the rubric of juror misconduct, we recognize that even if the defendant's version of events were true, these events would not constitute misconduct by a juror, but are more properly characterized as implicating the juror's partiality. See generally *Daley* v. *J.B. Hunt Transport, Inc.*, 187 Conn. App. 587,     A.3d    (2019) (contrasting juror misconduct from questions of juror competency).

————————————————